482 F.2d 1061
 Charles L. MEDLEY, an infant, by Gracie Medley Hairston et
al., Appellants,
v.
The SCHOOL BOARD OF the CITY OF DANVILLE, VIRGINIA, et al.,
Appellees.
Charles L. MEDLEY, an infant, by Gracie Medley Hairston et
al., Appellees,
v.
The SCHOOL BOARD OF the CITY OF DANVILLE, VIRGINIA, et al.,
Appellants.
 Nos. 72-2373, 72-2374.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 5, 1973.
Decided Aug. 3, 1973.
 
 S. W. Tucker, Richmond Va. (Henry L. Marsh, III, Hill, Tucker & Marsh, J. L. Williams, Danville, Va., Charles M. L. Mangum, Lynchburg, Va., Jack Greenberg, James M. Nabrit, III, and Norman J. Chachkin, New York City, on brief), for appellants in No. 72-2373 and for appellees in No. 72-2374.
 G. Kenneth Miller, Richmond, Va. (May, Garrett, Miller & Parsons, Richmond, Va., Earle Garrett, Jr., Earle Garrett, III, and Garrett, Garrett & Smith, Danville, Va., on brief), for appellees in No. 72-2373 and for appellants in No. 72-2374.
 Before HAYNSWORTH, Chief Judge, and WINTER, CRAVEN, BUTZNER, RUSSELL and FIELD, Circuit Judges, sitting en banc.
 FIELD, Circuit Judge:
 
 
 1
 This action was instituted following a direction from the Department of Health, Education and Welfare [HEW] to the Danville Virginia School Board that it review its policy of pupil assignment in the light of Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). In the absence of a definitive proposal by the school board for 1972-73 the District Court for the Western District of Virginia, 350 F.Supp. 34, devised a plan of desegregation which reflected to a large degree the geographical setting of the City which is divided by the Dan River into areas lying north and south thereof.
 
 
 2
 The plaintiffs who represent black school children seek to alter or amend the judgment of the District Court, specifically requesting that the Court require the school board to propose a plan which will produce a unitary system or, in the alternative, authorize the plaintiffs to employ a consultant at school board expense to prepare such a plan. In its cross-appeal the school board asserts that there was insufficient evidence to support a finding that it had failed to dismantle its previously segregated system. We find the position of the school board to be untenable and remand for further proceedings.
 
 
 3
 The history of the Danville school system supports the finding of the District Court that a further dismantling thereof was required. Although the school board stated in 1964 that six of the seventeen schools were integrated, the record indicates that as of that date only twenty-one blacks had transferred to formerly all-white schools, and that the schools in Danville were virtually allblack or all-white. In its May 18, 1965, Statement of Policies and Plan for Compliance with Title VI of the Civil Rights Act of 1964, the school board adopted a freedom of choice plan which was similar to that delineated by the Fifth Circuit in United States v. Jefferson County Board of Education, 372 F.2d 836, 897 (5 Cir. 1966).
 
 
 4
 Thereafter, in 1969, the school board geographically zoned five elementary schools and expanded faculty integration. Under this plan which met with the approval of HEW thirteen of eighteen schools were integrated with seventeen per cent of the black student population attending integrated schools. The following year, 1970-71, the school board adopted a plan which had as its stated objective that no student would attend an all-black or all-white school. This plan created one high school to be attended by all students in Danville, one junior high school for students living on the north side of the Dan River and two geographically zoned junior high schools on the south side. Elementary schools which had not been zoned in the previous year were either zoned or paired and one all-black elementary school was closed. Under the 1970-71 plan four of the elementary schools had a black enrollment of eight per cent or less. On the other hand, four south side elementary schools had black enrollments ranging from seventy-four per cent to eighty per cent.
 
 
 5
 The 1970-71 plan was also approved by HEW but, as heretofore stated, in July 1971 the Department advised the school board to review its policy pursuant to Swann, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554. The school board responded by rezoning the attendance area of one elementary school and HEW refused to approve the plan with only this one alteration. It appears that the school board has obtained no further suggestions or directives from HEW.
 
 
 6
 The plan which was devised by the District Court without the benefit of substantial guidelines from either the school board or the plaintiffs redrew school attendance zones for grades one through four; ordered busing for students on the respective sides of Dan River to two fifth and sixth grade centers; and changed the feeder schools for the three junior high schools. Aside from the high school, the District Court's plan did not provide for any attendance zone which embraced students living on both sides of the river. The District Court appears to have concluded that such attendance zones would be impracticable since they would require the students to travel in a highly congested and hazardous corridor created by the river and highway during a time of prime usage by mills and other businesses. Incident to this conclusion it should be noted that the school board does not own or operate a busing system.
 
 
 7
 Under the Court's plan no child in Danville will attend a school located on the side of the river opposite his home until he enters the high school in the tenth grade. As a result forty-two per cent (734) of the city's 1754 black elementary school children will be enrolled in two schools with black enrollments of eighty-nine per cent and ninety-one per cent, respectively. Additionally, eleven per cent (210) of the black elementary school population will attend five schools with black enrollments of fourteen per cent or less. Counsel for the school board suggest that the plaintiffs' reliance upon the foregoing statistics in their challenge of the plan is, in effect, an insistence that each school should mirror the racial composition of the entire system.
 
 
 8
 On the record in this case we do not find this characterization of the plaintiffs' position to be a valid one. While the Supreme Court stated in Swann that "[t]he constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole," 402 U.S. at 24, 91 S.Ct. at 1280 the Court made the further observation that
 
 
 9
 "Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominately of one race, they have the burden of showing that such school assignments are genuinely nondiscriminatory. The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part." 402 U.S. at 26, 91 S. Ct. at 1281.
 
 
 10
 Reacting to Swann, this court in Adams v. School District Number 5, Orangeburg Co., S.C., 5 Cir., 444 F.2d 99, 101, noted:
 
 
 11
 "Wherever schools are 'all or predominately of one race in a district of mixed population [there will be required] close scrutiny to determine that school assignments are not part of state-enforced segregation.' Swann, supra, at 25 [of 402 U.S., 91 S.Ct. 1267] . . . . Although the existence of 'some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system which still practices segregation by law,' Swann, supra, at 26, 91 S.Ct. at 1281 . . ., both the school authority and the district judge must nevertheless be concerned with the elimination of one-race schools."
 
 
 12
 In the light of the history of state-enforced segregation in the Danville schools, the marked residual disparity in the racial balance of the schools under the plan of the District Court strongly suggests that the plan is ineffective to attain an acceptable degree of realistic desegregation.
 
 
 13
 The nub of the problem in the Danville system is, of course, the Dan River just as Interstate 65 was the divisive factor confronting the Court in Davis v. School Comm'rs of Mobile County, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971). There, the interstate highway divided the metropolitan area of Mobile into definitive eastern and western sections. The schools in the eastern section were sixty-five per cent black and thirty-five per cent white while the western section had an enrollment which was twelve per cent black and eighty-eight per cent white. The elementary school plan approved by the Court of Appeals did not provide for any combination of the schools on the eastern side with the predominately white schools of the western section with the result that sixty-four per cent of all of the black elementary children attended nine schools on the east side which were more than ninety per cent black. In remanding the case for the development of a decree "that promises realistically to work, and promises realistically to work now,"[1] the Court stated:
 
 
 14
 "Like the District Court's plan, the Court of Appeals' plan was based on treating the western section in isolation from the eastern. There were unified geographic zones, and no transportation of students for purposes of desegregation. * * * Having once found a violation, the district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation. A district court may and should consider the use of all available techniques including restructuring of attendance zones and both contiguous and noncontiguous attendance zones. See Swann, supra, at 22-31 [of 402 U.S., 91 S.Ct. 1267]. The measure of any desegregation plan is its effectiveness.
 
 
 15
 "On the record before us, it is clear that the Court of Appeals felt constrained to treat the eastern part of metropolitan Mobile in isolation from the rest of the school system, and that inadequate consideration was given to the possible use of bus transportation and split zoning." 402 U.S. 33 at 36, 37, 38, 91 S.Ct. 1289, 1291, 1292, 28 L.Ed.2d 577.
 
 
 16
 The situation in Danville is strikingly parallel to Davis. There are seven elementary schools on the north side of the river with a student population which is eighty-seven per cent white and thirteen per cent black. There are also seven elementary schools on the south side of the river with an enrollment which is fifty-four per cent white and forty-six per cent black. The over-all population of elementary students in the system is sixty-nine per cent white and thirty-one per cent black. In the light of these statistics we are of the opinion that the District Court fell into the same error as the lower court in Davis in formulating a plan which treated the two sections of the city in isolation one from the other and which resulted in a number of schools which are racially identifiable when measured by any reasonable gauge. It appears that the District Court recognized this fact when he stated in his opinion that under the plan the fifth and sixth grades as well as the junior high schools would "reflect the black-white ratios of students on each side of the river."
 
 
 17
 It is clear that the District Court felt that the circumstances prevailing in Danville warranted the retention of neighborhood elementary schools on each side of the river. In Thompson v. School Board of City of Newport News, Va., 465 F.2d 83 (4 Cir. 1972), we recognized that under proper circumstances the assignment of the primary grades to neighborhood schools is not per se unacceptable, but we emphasized that such assignments must rest upon specific findings which demonstrate that no other plan affording greater integration is practicable. The record in the present case reveals no problem with respect to either the time or distance of travel incident to the utilization of noncontiguous attendance zones embracing elementary students on both sides of the river. Illustrative of this fact, the record indicates that the distance between Woodberry Hills Elementary School on the north side and Westmoreland and Berkeley schools on the south is a minimal one mile, and three of the city's five bridges lie within these attendance zones. Under the Court's plan, however, Woodberry Hills would have a student population that is eighty-eight per cent white while Berkeley and Westmoreland would have black enrollments of eighty-nine and ninety-one per cent, respectively.
 
 
 18
 It would seem that the primary emphasis of the District Court's conclusion of impracticability rests upon the assumption that the elementary children would be required to walk across the bridges which concededly are inadequate for pedestrian traffic. We think that in reaching this conclusion the District Court failed to fully consider and develop the possibility of transportation for these children. Again adverting to Davis, we feel that the Court failed to give appropriate consideration to the "possible use of bus transportation and split zoning" to solve the geographical problem which confronted it. The school board's present lack of transportation facilities is not controlling. If reassignment is constitutionally mandated the district court's equity power includes the authority to require transportation when it is necessary to disestablish a dual school system. See Brewer v. School Board of City of Norfolk, Virginia, 456 F.2d 943, 947 (4 Cir. 1972).
 
 
 19
 Following the Swann and Davis decisions, in Adams we remanded several cases to the respective district courts with the admonition that "[t]he school authorities and the district court should consider the use of all techniques for desegregation, including pairing or grouping of schools, noncontiguous attendance zones, restructuring of grade levels, and the transportation of pupils." 444 F.2d at 101. Our review of the record indicates that similar action is appropriate in the present case. To that end, we remand the case to the District Court with the following instructions: (1) The school board shall submit to the District Court a plan for the elementary and junior high schools which will effectuate the mandates of Swann and Davis, giving full consideration to the techniques set forth in Adams; (2) the District Court may direct the school board to consider the services of an expert or the office of HEW to assist it in drafting an acceptable plan; (3) the District Court shall conduct a hearing to determine the effectiveness of the proposed plan and may hear objections or proposed amendments prior to his approval thereof; (4) if the District Court should find that the plan of the school board does not fully implement Swann and Davis, he may use a consultant to develop a plan and assess the consultant's reasonable fee against the school board.
 
 
 20
 The plaintiffs have requested attorneys' fees and upon the remand the District Court shall make a reasonable allowance for such fees pursuant to Section 718 of the Emergency School Aid Act of 1972 for services rendered herein subsequent to June 30, 1972. Northcross v. Memphis Board of Education, 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed. 2d 48 (1973); Scott v. Winston-Salem/Forsyth County Board of Education, 475 F.2d 1400 (4 Cir. 1973); Shepard v. Fayetteville City Board of Education, 475 F.2d 1400 (4 Cir. 1973).
 
 
 21
 Remanded with directions.
 
 
 22
 WINTER, Circuit Judge (concurring and dissenting):
 
 
 23
 I concur in the judgment and opinion of the court except with respect to the allowance of counsel fees. I adhere to the view I expressed in Bradley v. Richmond School Board, 472 F.2d 318 (4 Cir. 1972), cert. granted, 412 U.S. 937, 93 S. Ct. 2773, 37 L.Ed.2d 396 (1973), and I would direct an allowance for all services rendered since July 30, 1971, the date on which the current phase of the litigation was begun.
 
 
 
 [1]
 Green v. County School Board, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968)