Frank V. THOMPSON et al.,
Plaintiffs,

v.

The SCHOOL BOARD OF the CITY OF
NEWPORT NEWS, VIRGINIA,
et al., Defendants.

Civ. A. No. 102–70–NN.

United States District Court,
E. D. Virginia,
Newport News Division.

Sept. 11, 1973.

See also 4 Cir., 472 F.2d 177.

Hill, Tucker & Marsh, Henry L. Marsh, III, and James W. Benton, Jr., Richmond, Va., Philip S. Walker, Newport News, Va., for plaintiffs.

P. A. Yeapanis, City Atty., Robert V. Beale, Newport News, Va., for defendants.

MEMORANDUM

WALTER E. HOFFMAN, District Judge.

Pending since July 23, 1970, this school desegregation case is again before the court pursuant to a remand issued on August 2, 1972, in an opinion written by Circuit Judge Russell for an *en banc* court. The remand issue, as set forth in the opinion, is apparently limited "to consider fully any alternate plans that may be presented by the plaintiffs and others and to determine whether, on the basis of specific findings of fact, there is any practical or feasible alternative, promising greater racial balances in these two grades [grades one and two], to the neighborhood plan proposed by the school district, and, if there is, to amend the plan of desegregation accord-

ingly." As an ancillary matter, the district court was directed to give further consideration to the allowance of attorney's fees under the terms of Section 718, Higher Education Act of 1972.[1]

For the 1973–74 school year the School Board is establishing kindergarten classes in certain schools. Essentially, the Board proposes to assign these youngsters on a neighborhood school basis in very much the same manner as children are now being assigned to grades one and two although, as noted, some neighborhood schools are not equipped to handle kindergarten classes, in which event the children are being assigned to the nearest neighborhood school where kindergarten classes are operating. There were also certain administrative amendments of zone lines required by shifting and increasing school population which are not contested.

The ultimate question, aside from the attorney's fees, rests in a determination as to whether children attending kindergarten and the first two grades of the elementary school should be permitted to continue in attendance at the neighborhood school, or whether they must be involuntarily transported to other schools, all under the particular facts of this case.

The record now before the court includes all prior testimony given at the several hearings which resulted in an opinion from the bench on August 12, 1971, together with the additional evidence presented pursuant to the remand.

We must also consider the recent case of Keyes v. School District No. 1, Denver, Colorado, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548, decided June 21, 1973, with particular emphasis on the opinion of Mr. Justice Powell wherein he concurs in part and dissents in part, 413 U.S. 217, 93 S.Ct. 2701. While we cannot state that all of the language of Mr. Justice Powell should be considered as the words of all the members of the Supreme Court, it is abundantly clear that the instant case is a matter of concern to the nation's highest court.[2]

In part, at least, the prior oral opinion of this court makes it clear that the health and mental processes of young children would be adversely affected by requiring them to be transported for many miles requiring long periods of time. In footnote 7 of the Court of Appeals' opinion, 465 F.2d 83, it is suggested that the findings of the district court were not specific and that, as to the medical evidence, the district court said that it could not "accept this 'testimony in its entirety.'" The medical evidence was to the effect that children up to the age of twelve were adversely affected to a marked degree when required to be transported to the extent contemplated by the initially submitted Board plan which effectively retained the neighborhood school plan for all elementary grades. The court, in its earlier comments, had intimated very strongly that the adverse effects upon children attending grades one, two and three were such that the court would consider the neighborhood school plan for these three grades, but would require bussing of children beginning with grade four. In response, when the Board submitted its new plan, it retained the neighborhood school for grades one and two only and, of course, for like reasoning it is retained for the kindergarten grades.

1. Thompson v. School Board of Newport News, 465 F.2d 83 (4 Cir. 1972).

2. In footnote 17 of the opinion of Mr. Justice Powell, reference is made to the present case as an example of "Lower federal courts have often read *Swann* as requiring far-reaching transportation decrees 'to achieve the greatest possible degree of actual desegregation.'" In the footnote, Justice Powell points out that the Fourth Circuit upheld a district court assignment plan where "travel time, varying from a minimum of forty minutes and a maximum of one hour, each way, would be required for busing black students out of the old City and white students into the old City in order to achieve a racial balancing of the district." Justice Powell notes that this transportation "was decreed for children from the third grade up, involving children as young as eight years of age."

■ Rather amazingly, following the remand, plaintiffs presented no evidence controverting the previously submitted testimony of Dr. Hogge, a thoroughly qualified pediatrician. Dr. Hogge gave further evidence on the same subject at the remand hearing. His testimony stands uncontradicted, it is credible, and is hereby accepted, with the court finding that children attending kindergarten and the first and second grades are physically and psychologically affected by any suggested compulsory bus transportation for long periods of time, to such an extent that the balancing of interests should be resolved in favor of the health of the child.[3]

The controlling authority is, of course, Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), where it was affirmatively recognized that the age of the pupils to be transported was an important limitation on the time of student travel. Transportation orders are suspect "when the time or distance of travel is so great as to either risk the health of the children or significantly impinge on the education process." Swann, 402 U.S. at 30, 91 S.Ct. at 1283. As Mr. Justice Powell states:

"But with school desegregation, reasonableness would seem to embody a balanced evaluation of the obligation of public school boards to promote desegregation with other, equally important educational interests which a community may legitimately assert."

The opinion of Mr. Justice Powell is a breath of fresh air on the complex problem of bussing in metropolitan districts "with dense and shifting population, numerous schools, congested and complex traffic patterns." Swann, 402 U.S. at 14, 91 S.Ct. at 1275. In fact, it expresses so adequately the views of the author of the present opinion that it is only necessary to adopt Justice Powell's views in their entirety.

This is not to say that every city or county may automatically adopt a plan preserving the neighborhood school for grades one and two. It depends upon the factual situation presented and, as suggested by the Fourth Circuit, Newport News is unique by reason of its geographic pattern and complex traffic arteries.

It should be noted that the school buildings, where the neighborhood plan is effective, are nevertheless desegregated as to the totality of the pupils in attendance. Plaintiffs' objection is grounded on the fact that, in the old city which is predominantly black, the children attending grades one and two will retain a very high percentage of blacks, whereas in the new city the situation would be reversed. It is abundantly clear that the purpose of the School Board is to protect the young child, physically and psychologically, by reason of the complex traffic problems which must be encountered in any massive bussing undertaking. Discrimination is not in issue in this case.

We turn to the plans advocated by the plaintiffs without specifically reviewing the traffic problems so well summarized by the opinion of Judge Russell. The old city consists of a small area of approximately four square miles lying at the extreme southern tip of the Virginia peninsula, while the new city is northeast of the old city and covers an area of more than sixty square miles. The old city contains approximately eighty percent of the total black population, with the new city having substantially all of the white population.

■ The problem of desegregating the entire school population is complicated by the fact that traffic going to and from the old city must pass over one of two major north-south arteries within the city. Both of these arteries have extremely heavy volumes of traffic during the time when the school busses would

---

3. Even plaintiffs' expert, Dr. Strickler, concedes that if the mental health of the child is adversely affected, then the issue of health should take precedence over equality of education (T. 104, 105).

be running. As to the children in grades one and two, as well as in the kindergarten, desegregation of these grades can only be achieved by requiring these young children (ages five, six and seven) to undergo a lengthy bus ride. We conclude from all of the evidence that it would not be practical or feasible to require these youngsters to be thus transported, bearing in mind the time and length of travel as well as the probable adverse effect upon the physical health and mental processes of the children. The state and parental interests in having these young children attend schools within a reasonable vicinity of home are far superior to mixing the bodies in these starting grades, especially where the school as a whole is attended by an adequate number of whites and blacks.[4]

For grades three to twelve, the Board's plan achieves approximately a 65–35 white to black ratio for the schools, same being the approximate racial balance of the city.

Plaintiffs' two plans each require extensive bussing of children in the first and second grades. The same would be true for the kindergarten classes. The Strickler plan was created by Dr. John Strickler, a professor at the University of Miami. Strickler looked at the universal racial balance of the entire city and then devised his plan predicated on the goal of not deviating more than fifteen percent from this racial balance. He expressed the view that if the first and second grades did not meet this fifteen percent, the particular school would be racially identifiable even though the overall composition of the entire student body complied with his standard. Manifestly, this plan was devised solely for the purpose of mixing bodies based upon race.

The Strickler plan was prepared almost entirely from the "Enrollment by Race" as of September 29, 1972, together with the "Elementary Attendance Zone Chart, 72–73," which was used to update part of the plan. Basically, Strickler took the School Board plan and then divided its 38 zones[5] into 13 different groupings. Three of these groupings are composed of single attendance zones where all the children in grades one through seven attend schools within the zone. Seven of the groupings are composed of paired noncontiguous zones involving the same concept as used in the Board's plan, with one of the zones in the old city and one in the new city. The grade groupings under Strickler would differ from the Board's grouping. For example, in Group 5 the school in the new city would be for all children in grades one through five, and the school in the old city would be for grades six and seven. In Group 6, the school in the old city would be for grades one through three, and the school in the new city would cover grades four through seven. The final three groupings pair more than two attendance zones, with Group 11 pairing four, Group 12 pairing seven, and Group 13 pairing ten.

Strickler assigned children and grades to each school based on the capacity of each building. The building capacities used by him were out-of-date and not in conformity with new regulations promulgated by the State Board of Education. Strickler candidly admitted that, as of the date he prepared the plan, he had never been in Newport News; he was not aware of the changes in the capacities of some of the buildings; and did not have the latest information on the enrollment figures in the various zones. While these factors, standing alone, may not be fatal to his plan, what

4. We do not have before us the question as to whether the district court went too far in ordering involuntary bussing in grades three through twelve. We consider this issue foreclosed by the Court of Appeals opinion and mandate, and certiorari was thereafter denied on June 26, 1973, five days after *Keyes* was announced.

5. By reason of the shifting population the Board's plan has been slightly revised to cover 40 zones. This change is not fatal to the Strickler plan as it could be revised if adopted.

is fatal is the fact that Strickler freely admitted that the transportation problem did not concern him; nor did he feel that the time and distance of travel had anything to do with the case. Strickler's total ignorance of the problems created by his plan is highlighted by the fact that the Newport News Shipbuilding and Drydock Company, employing 27,000 persons, is located in the southeastern section of the city and contributed enormously to the problem. Apparently all that Strickler knew about transportation was that his plan would increase the bussing in Newport News by seventeen percent over the existing approved plan.

The plaintiffs' other plan was rejected at the hearing in August 1971 because it was not timely submitted. It has now been considered along with some modifications as to the number of students who would attend four schools. For grades three through seven, it is substantially similar to the court-approved plan in that it pairs zones and requires children in grades three through five to attend school in the new city, with grades six and seven attending in the old city. It also provides for the total desegregation of grades one and two.

Because of the complete failure of either of plaintiffs' plans to consider the transportation problems, coupled with the effect upon the health of the children, neither plan is deemed to be practical and feasible, and each is rejected.

In reaching this conclusion, we have relied heavily upon three factors—(1) the transportation problems within the city, (2) the educational process, and (3) the health and age of the very young children who would be transported under either plan.

Under the Strickler plan the minimum time spent on any bus by first and sec-ond graders would be 25 minutes—the average time would be 42 minutes—the maximum time would be 65 minutes. These figures would be *doubled* for a round trip. In distance, the shortest run would be 6 miles—the average would be 12.9 miles—the maximum would be 27 miles. These distances would be *doubled* for a round trip.

The hazards confronting these children of tender years cannot be overlooked. There are only two major north-south traffic arteries. The accident rate at the main point of congestion has increased appreciably since the existing plan was put into effect. It would, of course, be extended if the court required transportation of the children in the first and second grades.[6] The study area, which is the focal point of the north-south congestion area, reveals about 4500 vehicles in transit during the hours the school busses must operate.

Due to the bussing requirements imposed by the court-approved plan, it has become necessary to reduce the school day to five and one-half hours, with a resulting reduction in the children's lunch period. If additional bussing is now required it is not unlikely that a further reduction will become necessary. Certainly this impinges upon the educational process of all children. As Justice Powell noted:

> "Any child, white or black, who is compelled to leave his neighborhood and spend significant time each day being transported to a distant school suffers an impairment of his liberty and his privacy. Not long ago, James B. Conant wrote that 'at the elementary school level the issue seems clear. To send young children day after day to distant schools seems out of the question.' A community may well

6. We are well aware of the arguments with respect to historical misuse of transportation for the purpose of perpetuating segregation, and the fact that bus transportation is frequently the only means available for a child to obtain an education. But as Justice Powell notes in *Keyes*, footnote 23, "But misuse of transportation in the past does not imply neighborhood schooling has no valid nonsegregatory uses for the present. Nor would wrongful transportation in the past justify detrimental transportation for the children of today."

conclude that the portion of a child's day spent on a bus might be used more creatively in a classroom, playground, or some other extracurricular school activity. Decisions such as these, affecting the quality of a child's daily life, should not lightly be held constitutionally errant."

We do not hesitate to stamp our approval on this reasoning and, at the same time, we are mindful of the generally accepted premise that it is well to mix the races at an early age. The Board's plan provides a happy compromise. It brings whites and blacks together in the same school building but, at the same time, preserves the neighborhood school concept for the worthy purpose of keeping children of tender years in an area which is within a reasonable vicinity of home. Children of the age of five, six and seven are undergoing a traumatic experience in life in getting accustomed to school and school work. In many cases they are in need of parental guidance even during school hours. Removing them to distant areas, not readily accessible to parents and those in *loco parentis*, will not aid the problem.

Neither of plaintiffs' plans took into consideration the facilities at the particular schools. As the school superintendent suggested, buildings are designed with certain allowances for class size, toilet facilities, and location of particular floors of each building. School systems are expected, with reasonable exceptions, to follow the original specifications in assigning children to classes. The Strickler plan apparently took the approximate number of classrooms in each school, multiplied by thirty, thus giving the student capacity. It is, of course, impossible to draw a series of school zones with multiples of thirty children for each grade level, as such an approach would make it mathematically impossible to fill the schools to capacity, even though it may be technically possible to administer the plan in some manner.

Reverting to *Brown II*, (Brown v. Board of Education of Topeka) 349 U.S. 294, 299, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), the district courts, locally situated, were vested with wide discretion in effectuating decrees guided by equitable principles. While there have been instances of abuse by district courts, as well as appellate courts, each case must stand on its own facts. Even in Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), where the freedom-of-choice doctrine was severely limited, the Supreme Court recognized that there was no universal answer to complex problems of desegregation and that no one plan would do the job in every case, it being the duty of the district court to assess the matter in light of the circumstances present and the options available. The Board's plan, bearing in mind the unique circumstances presented in Newport News, promises meaningful and immediate progress toward disestablishing the prior state-imposed segregation, and it is constitutionally valid.

*Swann, supra,* acknowledges that, in some circumstances, certain schools may remain all or largely of one race until new schools can be provided or neighborhood patterns change. And in discussing the vital subject of transportation, after mentioning the time and distance of travel which may *risk* the health of the children or significantly impinge upon the educational process, *Swann* observed:

"It hardly needs stating that the limits on time of travel will vary with many factors, but probably with none more than the age of the students. The reconciliation of competing values in a desegregation case is, of course, a difficult task with many sensitive facets but fundamentally no more so than remedial measures courts of equity have traditionally employed."

If certain proper circumstances may justify an entire school remaining of one race then, *a fortiori*, the same circumstances will justify the two lowest

grades and kindergarten remaining predominantly of one race, especially considering the time of travel and age of the children. There are those in high position who have openly stated that *Swann* is being misread or erroneously interpreted. The present case is the final test of *Swann*. If it is reversed, we know that the appellate courts are only interested in the numerical mixing of bodies. If it is affirmed, it will indicate that there are some areas, under certain conditions, where the School Board has some discretion in exercising its judgment.

For the reasons heretofore stated, the plan submitted by the Board, as amended to provide for kindergarten classes and the increase in zones, is approved. The plans submitted by the plaintiffs are rejected.

## ATTORNEY'S FEES

█ In the opinion of the Court of Appeals, little is said as to attorney's fees, the matter being a part of the remand. It is said the district court "may make such allowances of attorney's fees as it finds proper under the terms of Section 718, Higher Education Act of 1972," 20 U.S.C.A. § 1617.

Subsequently this case, as well as others, was submitted to the Court of Appeals on the issue of retroactivity of the Higher Education Act of 1972, 20 U.S.C.A. § 1617. The court held that, with certain exceptions not here pertinent, Section 718 of the Higher Education Act of 1972 was not retroactive. Since the Act became effective on July 1, 1972, all of the work done by plaintiffs' attorneys was prior to that date, unless we are to consider the remand proceedings as a part of the original case. However, in Thompson v. School Bd. of City of Newport News, Va., 472 F.2d 177 (4 Cir. 1972), the court held Section 718 applicable "to any case pending before it after the section's enactment" but "that only legal services rendered after the effective date of Section 718 are compensable under it."

From a technical standpoint, this case was not pending in the district court when Section 718 became effective. It was then pending in the Court of Appeals. However, we will not split hairs on this issue as we assume that a reasonable interpretation of the subsequent remand is sufficient to have made the case "pending," and it is immaterial whether it was pending in the district court or before the Court of Appeals.

Since the *Thompson* decision on attorney's fees, the Fourth Circuit has reaffirmed its position in Shepard v. Fayetteville City Board of Education, 475 F.2d 1400 (4 Cir., 1973); Scott v. Winston-Salem/Forsyth County Board of Education, 475 F.2d 1400 (4 Cir., 1973); and Medley v. School Board of City of Danville, 482 F.2d 1061 (4 Cir., 1973). It is interesting to note that in the last cited case the court discusses the merits in *Thompson* by saying: "We recognized that under proper circumstances the assignment of the primary grades to neighborhood schools is not *per se* unacceptable, but we emphasized that such assignments must rest upon specific findings which demonstrate that no other plan affording greater integration is practicable." We trust that the findings discussed above are sufficiently specific.

In *Thompson*, 472 F.2d 177 (4 Cir. 1972), the court said:

"In the Newport News case, most of the legal services are yet to be rendered, and we are unanimously of the view that, *if relief is granted*, fees will be allowable under § 718 for those future services." (Emphasis supplied.)

The School Board urges that no allowance may be made because *relief is not being granted*. It is true, in the remand proceedings, that plaintiffs are not being granted any relief. They did, of course, obtain the same relief they are now being given when the district court handed down its oral opinion on August 12, 1971, followed by its final order entered on August 23, 1971. The defendants' motion for stay pending appeal was denied on August 25, 1971. Each side then appealed.

While we believe the Court of Appeals was in error in suggesting that "most of the legal services are yet to be rendered," we do not construe the words "if relief is granted" to be so limiting as to suggest that, as a prerequisite to the allowance of an attorney's fee, the plaintiffs need necessarily prevail as to a plan to desegregate grades one and two. The words "if relief is granted" were, as applied to the Newport News case, gratuitously added. It is the same case which was before the district court in August 1971. It had been affirmed in part and remanded in part. Assuredly, had § 718 of the Higher Education Act been effective in August 1971, the court would have been constrained to make an allowance for attorney's fees.[7] The final judgment order to be entered pursuant to this memorandum is merely a reaffirmation of the prior ruling but final relief is being afforded the plaintiffs.

The phrase "if relief is granted" is some limitation on the part of counsel who bring frivolous or multiple actions for the purpose of securing fees. Such is not this case as, when instituted in July 1970, there was merit to the action.

Proceeding to the question of allowance of attorney's fees, we are concerned about several factors. The principal participating counsel were Henry L. Marsh, III, and James W. Benton, Jr., of the firm of Hill, Tucker and Marsh in Richmond, Virginia. A Newport News attorney, Philip S. Walker, made one appearance in the proceedings prior to June 30, 1972, but not thereafter. The New York counsel for the NAACP never appeared in court, but their names are typed on the complaint.

We do not understand that plaintiffs' counsel insist that allowances be made to anyone other than to Messrs. Marsh, Benton and Walker. While counsel submitted a "Time and Services" sheet for services rendered for work done prior to June 30, 1972, we have disregarded same as being prior to the effective date of § 718 of the Higher Education Act of 1972.

We are concerned with the fact that counsel are multiplying their efforts with two or more attorneys, whereas one attorney does essentially all of the work. And we are concerned that Richmond attorneys are primarily engaged in the services and we do not know whether any travel time is included. The hours listed under "Research" and "Preparation for Trial" would seem excessive [8] as the plaintiffs only called Dr. Strickler, and the Associate Superintendent of Schools for a brief interrogation as an adverse witness. With the exception of Dr. Strickler's testimony, the remand hearing was a rerun of the 1971 hearing which, of course, had already been transcribed.

The difficult task of evaluating an attorney's services and the time required to perform same is indeed complex. Some courts have equated attorney's fees in cases such as this along with services rendered under the Criminal Justice Act, thus fixing a maximum of $30.00 per hour for in-court time, and $20.00 per hour for out-of-court time.

Plaintiffs argue that the Supreme Court in Northcross v. Memphis Board

---

7. The statute, 20 U.S.C.A. § 1617, refers to the words *"may allow the prevailing party"* a reasonable attorney's fee. The opinions of the Court of Appeals seem to remove any discretion on the part of the district court, but the Supreme Court has said that "ordinarily" an attorney's fee should be allowed "unless special circumstances would render such an award unjust." Northcross v. Memphis Board of Education, 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973).

8. There are variations between the times claimed for in-court appearances and the record maintained by the official reporter. Times claimed for the pretrial conference on October 17, 1972, and for final arguments on July 6, 1973, are correct. The hearing on April 13, 1973, required 5 hours and 4 minutes, whereas 6 hours were claimed. The hearing on April 18, 1973, required 2 hours and 35 minutes, whereas 4 hours were claimed. Apparently counsel are including time consumed for luncheon recess. Additionally, 10½ hours are claimed for preparing a 6-page post-trial brief.

**466**

of Education, 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973), has stated that counsel fees are to be "liberally" allowed. The word "liberal" is not contained in the opinion. We agree that the court should *ordinarily* allow a reasonable fee, but we decline to interpret this reasoning as being applicable to the quantum of the award in the sense that it should be "liberal."

We have attempted, in arriving at a reasonable fee, to consider all factors mentioned above together with traditional criteria applicable to the allowance of all attorneys' fees. We have arrived at the conclusion that plaintiffs' attorneys are entitled to $3,500.00 for services on and after July 1, 1972.

Aware of the fact that certiorari has been granted in Bradley v. Richmond School Board, 412 U.S. 937, 93 S.Ct. 2773, 37 L.Ed.2d 396 (1973), we have reviewed the services performed prior to July 1, 1972. We fix the value of these services at $6,000.00, but make no allowance for same as they were incurred prior to the effective date of § 718 of the Higher Education Act of 1972.

A final judgment order may be presented in accordance with this memorandum.