Warren H. WHEELER et
al., Appellants,

v.

The DURHAM COUNTY BOARD OF
EDUCATION, a body politic, et
al., Appellees.

Nos. 74–2137, 74–2138.

United States Court of Appeals,
Fourth Circuit.

Argued May 8, 1975.

Decided Aug. 4, 1975.

J. LeVonne Chambers, Charlotte, N. C. (Adam Stein, Charlotte, N. C., Jack Greenberg, James M. Nabrit, III, Norman J. Chachkin, New York City, William A. Marsh, Jr., and J. H. Wheeler, Durham, N. C., on brief), for appellants in Nos. 74–2137 and 74–2138.

Marshall T. Spears, Jr., Durham, N. C., and (Jerry L. Jarvis, Durham, N. C. on brief), for appellee Durham City Board of Education in Nos. 74–2137 and 74–2138.

James L. Newsom, Durham, N. C. (Newsom, Graham, Strayhorn, Hedrick, Murray & Bryson, Durham, N. C., on brief), for appellees Durham County Board of Education, its Superintendent and Members in Nos. 74–2137 and 74–2138.

Rufus C. Boutwell, Jr., Asst. City Atty. (W. I. Thornton, Jr., City Atty., and Douglas A. Johnston, Asst. City Atty., on brief), for appellees The City Council of the City of Durham and the Individual Members of the City Council in Nos. 74–2137 and 74–2138.

Before BOREMAN, Senior Circuit Judge, and CRAVEN and FIELD, Circuit Judges.

CRAVEN, Circuit Judge:

These appeals are from orders entered in 1974 by the district court denying requests made by plaintiffs in 1972 for further injunctive relief with respect to desegregating the Durham City and County School systems. Both systems have been operating under plans approved by the district court in 1969 (County) and 1970 (City). The prior freedom-of-choice plans,[1] by then virtually condemned by the Supreme Court in *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968),[2] were abandoned in those years in favor of mandatory student assignments through geographic zoning, the stated goal of which was to establish immediately the requisite "unitary" system.[3] Finding that a unitary system had been attained under the 1969 and 1970 plans in each jurisdiction, the court below denied all injunctive relief and subsequently approved the Boards' plans for the 1974–75 school year.[4]

With respect to the City we hold that operation under its 1970 plan has not yet effectively eliminated "all vestiges of state-imposed segregation," and reverse. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). With respect to the County system we are of the opinion that a unitary system has been achieved, and affirm the denial of further relief.

---

1. See *Wheeler v. Durham City Bd. of Educ.,* 363 F.2d 738 (4th Cir. 1966) (en banc).

2. See also *Alexander v. Holmes County Bd. of Educ.,* 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969).

3. See *Nesbit v. Statesville City Bd. of Educ.,* 418 F.2d 1040 (4th Cir. 1969) (en banc) *consolidated with Thompson v. Durham County Bd. of Educ.,* No. 13,583 (4th Cir.).

4. The City plans submitted and approved consisted in a redrawing of high school attendance lines and pairing of two additional elementary schools with contiguous attendance zones. The basic approach of the original 1969–1970 schemes—geographic zoning—has to date remained unchanged. No "satellite" zoning or noncontiguous pairing techniques have been utilized.

The primary relief requested by plaintiffs in 1972 was a merger of the City and County systems or, in the alternative, an "annexation" by the City Administrative School Unit of that part of Durham City governed under the County School Unit, i. e., making the boundaries of the City school district coterminous with the City limits.[5] Those requests for inter-district relief were denied, the reasons for which are presently only of academic interest,[6] since plaintiffs have not appealed.

With respect to *intra*-district relief, the district court in a published opinion,[7] affirmed the continuing validity of the 1969–1970 plans. Attendance zones under those plans were modified pursuant to, and subsequently approved by, orders entered in July and August 1974, as discussed below. Although it had already adjudged the City Unit to be unitary, the district court in the latter order nevertheless directed the City to submit its proposed[8] revisions to its plan for the 1975–76 school year, ordering "[e]mphasis . . . placed on schools which currently have a white pupil enrollment of 20 per cent or less."

## I.

The main questions presented on appeal are:[9] (1) Did the district court err in ruling that implementation of the 1970 plan for the City had resulted in a unitary system? (2) Should the district court have rejected that portion of the County's proposed plan converting two majority-black schools to single-grade centers as unfairly burdening black students?

### A.

■ The second question requires little discussion. The "City Out"[10] area had recently experienced rapid growth in its black population due to the placement in that area of public low-cost housing, which growth created substantial black majorities in two of the area's elementary schools. Acceptance of the County's solution—as opposed to that advanced by plaintiffs—was within the discretion of the district court, and we so hold.[11]

The adopted solution was to change Lakeview and Bragtown Schools (previously grades 1–6 elementary schools) into single-grade schools: Lakeview became a kindergarten center for all pupils, black

---

5. Historically, because of the difference in school tax rates, residents of those portions of the County annexed by the City have been given the option to remain within and be governed by the County Administrative School Unit as opposed to the City Unit. Since 1955, most of the annexed areas have exercised that option. The so-called "City In" area—that part of Durham City governed by the City school board—now comprises about one-half of Durham City's geographic area. The "City Out" area—the remainder of Durham City—is governed, along with Durham County, by the County board.

6. *See Bradley v. School Bd. of City of Richmond, Virginia,* 462 F.2d 1058 (4th Cir. 1972), *aff'd by an equally divided court,* 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (1973).

7. *Wheeler v. Durham City Bd. of Educ.,* 379 F.Supp. 1352 (M.D.N.C.1974).

8. The City's "Report" on its attendance plan for 1974–75 (filed after the July 1974 order), after summarizing the relatively minor changes that would be made in geographic zones, stated:

5. A study of revision of attendance zones by the Board . . . is continuing, and if the proposed changes in the plan approved on July 31, 1970, are approved for the 1974–75 school year, the Board will present to the Court by January 15, 1975, a revised comprehensive plan for pupil assignments to be implemented at the beginning of the 1975–76 school year.

It is to this proposal that the above language in the court's August 1974 order was directed.

9. A third question, relating to possible future injunctive relief against city agencies responsible for low-cost housing, will be considered *infra.*

10. *See* n. 5 *supra.*

11. Since this is the only objection raised with respect to the County plan as currently implemented, our rejection thereof necessarily serves to approve the lower court's ruling that the County system is now unitary. We see no reason why the instant action as to it should not now be dismissed.

and white, within a larger geographic area,[12] and Bragtown became a sixth-grade center for all pupils, black and white, within that area. The result is that students in the predominantly white portion of this area will be bussed to Lakeview and Bragtown for the kindergarten and sixth-grade years, and that students in the predominantly black area, previously served only by Lakeview and Bragtown, will be bussed to the four other schools in this area for grades 1–5. The impact of bussing falls more heavily upon those students in the Lakeview-Bragtown area. The County justified its plan through testimony of Smith, an administrative assistant to the superintendent, to the effect that Lakeview and Bragtown were physically smaller or less adaptable for utilization as centers for grades 1–5. Dr. Yeager,[13] the County superintendent, testified that the six-school cluster proposed by the County and approved by the court would result in a better racial mix than two three-school clusters proposed by the County's consultant. The only way to further equalize the bussing burden would be to put another grade into Lakeview or Bragtown. But Lakeview was too small—capacity 250 or 300—and Bragtown's capacity, though larger (800) consisted partly of temporary buildings separated from the permanent structure. In view of the above testimony, we are unable to say that the court abused its discretion in opting for the County plan. *See Allen v. Asheville City Board of Education,* 434 F.2d 902 (4th Cir. 1970).

### B.

While giving due consideration to the district court's first-hand familiarity with the situation, we cannot, however, affirm his conclusion that the City system had achieved the requisite unitary state. In 1970–71, the first year of the City's implementation under the court-approved geographic attendance zone plan, some 13,100 students, with a black:white percentage ratio of 63:37 (8,200 blacks:4,900 whites),[14] were distributed among 24 schools, as to nine of which the following figures obtained:[15]

| | Grades | % | Black | White | Total |
|---|---|---|---|---|---|
| Brogden Jr. High | 7–9 | 21/79 | 139 | 511 | 650 |
| Shepard Jr. High | 7–9 | 92/8 | 453 | 38 | 491 |
| Whitted Jr. High | 7–9 | 93/7 | 731 | 54 | 785 |
| Burton | 1–6 | 85/15 | 503 | 92 | 595 |
| Fayetteville St. | 3–6 | 80/20 | 438 | 111 | 549 |
| Pearson | 1–6 | 95/5 | 680 | 35 | 715 |
| Powe | 1–6 | 25/75 | 119 | 349 | 468 |
| Spaulding | 1–6 | 97/3 | 491 | 14 | 505 |
| Watts | 1–6 | 35/65 | 112 | 210 | 322 |

The sum of the figures with respect to the six heavily black schools reveals that some 3,300 black students, approximately 40 percent of the 8,200 total City black student population, attended schools where they were in majorities ranging from 80 percent to 97 percent. In contrast to Shepard and Whitted, Brogden Junior High had a black enrollment representing a 42 percentage-point variation from the system as a whole; similarly, Powe and Watts Elementary Schools varied 38 and 28 percentage points, respectively.

In 1973–74, enrollment figures with respect to the same schools were:

| | Grades | % | Black | White | Total |
|---|---|---|---|---|---|
| Brogden Jr. High | 7–9 | 20/80 | 86 | 355 | 441 |
| Shepard Jr. High | 7–9 | 96/4 | 448 | 17 | 465 |
| Whitted Jr. High | 7–9 | 93/7 | 498 | 37 | 535 |
| Burton | 1–6 | 93/7 | 456 | 36 | 492 |
| Fayetteville St. | 3–6 | 89/11 | 452 | 57 | 509 |
| Pearson | 1–6 | 98/2 | 424 | 9 | 433 |
| Powe | 1–6 | 28/72 | 80 | 205 | 285 |
| Spaulding | 1–6 | 97/3 | 390 | 12 | 402 |
| Watts | 1–6 | 45/55 | 95 | 115 | 210 |

Total enrollment had in the meantime dropped to 10,000, 7,100 of which were black students, with a resulting change in the black:white ratio to 71:29. Again,

12. This larger area was comprised of the contiguous attendance zones for six elementary schools, each of which previously served grades 1–6: Holt, Hillandale, Glenn, and Merrick-Moore, as well as Lakeview and Bragtown.

13. Dr. Yeager, the author of the plan, had been hired in 1973 by the County, and his prior experience included consultant work and service as a Senior Civil Rights Advisor for HEW.

14. All figures are rounded off.

15. All tables through 1973–74 for both systems are reproduced in *Wheeler,* 379 F.Supp. at 1355–59.

aggregating the numbers of black students in those same six heavily-black schools, we note that some 2,700 blacks—approximately 38 percent of the total black student population—attended schools where they were in majorities ranging from 89 percent to 98 percent.

Finally, the City's plan 1974–75, approved by the district court, projected the following figures for those schools (Appx. 541):

| | Grades | % | Black | White | Total |
|---|---|---|---|---|---|
| Brogden Jr. High | 7–9 | 20/80 | 85 | 345 | 430 |
| Shepard Jr. High | 7–9 | 97/3 | 469 | 15 | 484 |
| Whitted Jr. High | 7–9 | 95/5 | 478 | 24 | 502 |
| Burton | 1–3 | 78/22 | 319 | 91 | 410 |
| Fayetteville St. | 3–6 | 91/9 | 469 | 45 | 514 |
| Pearson | 1–6 | 98/2 | 455 | 8 | 463 |
| Powe | 1–6 | 31/69 | 102 | 222 | 324 |
| Spaulding | 1–6 | 97/3 | 442 | 14 | 456 |
| Watts | 1–6 | 44/56 | 83 | 107 | 190 |

With total enrollment at 9,700, with 6,900 blacks, the black:white ratio was still 71:29. Some 2,600 black students—again representing almost 38 percent of the total black student population—were to attend six schools where, with one exception, they were in excess of a 90 percent majority. The exception—Burton Elementary School, to have a 78:22 ratio—represented the *one* substantial revision in the 1970 plan, as to these nine schools, effected by the City board in four years: Burton was paired with Holloway Street School, which theretofore had an approximate 50:50 ratio.

■ That for four years at least 38 percent of the black student population attended schools in which they were overwhelmingly in the majority—mostly in the 90 percent range—in a system whose total black student population rose eight percentage points from 63 percent to 71 percent, is, we think, unacceptable. In *Medley v. School Board of City of Danville, Virginia,* 482 F.2d 1061, 1063 (4th Cir. 1973), *cert. denied,* 414 U.S. 1172, 94 S.Ct. 933, 39 L.Ed.2d 120 (1974), we rejected a proposed plan resulting in virtually the same kind and degree of racial imbalance: there 42 percent of the city's black elementary school children were to be enrolled in two schools with black majorities of 89 percent and 91 percent.

The district court was ambivalent as to the City having attained a unitary condition. Reviewing the plan proposed by the City for the 1972–73 school year (but not adopted because of the then-pending prayer for consolidation), the court found as a matter of fact that, if subsequently adopted, it "will effect substantial progress in the further desegregation of [the City Schools], although this Court specifically refrains from deciding that such action is constitutionally required." *Wheeler,* 379 F.Supp. at 1366. Further on, the court stated: "The City of Durham has also acted in compliance with the [1970] court-approved desegregation plan. However, several schools in the City unit are now over 90 per cent black." *Id.,* at 1372. Finding no *per se* violation therein under *Swann,* it then stated: "However, the increasing racial imbalance in some schools . . . suggests the need for some revision." *Id.,* at 1372. While that opinion held that the City's affirmative duty had been accomplished, *id.,* at 1375, the subsequent August 1974 order "approved" the City's 1974–75 plan and further "directed" the submission for 1975–76 of proposed revisions "with emphasis" on schools having 80 percent or more black majorities. While the directive is consistent with the perceived "need for some revision," it is anomalous with respect to the court's denial of future injunctive relief on the express ground that the City system was unitary under *Green* and *Swann.*

■ *Swann* makes it quite clear that once a system is adjudged unitary under *Green,*

> [n]either school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished . . . .

402 U.S. at 31–32, 91 S.Ct. at 1284. Only with "a showing that either school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect

the racial composition . . ." should further intervention be necessary. *Id.,* at 32, 91 S.Ct. at 1284; *see Wright v. Council of the City of Emporia,* 407 U.S. 451, 479, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972) (Burger, C. J., dissenting). If we were to agree with the basic ruling that the City system had become unitary, we could not sanction the district court's continuing role in "directing" future revised plans to be filed for its "approval," but instead would have to order dismissal of the action under *Swann.*

The marked racial disparities here cannot be excused or explained away by referring to demographic changes resulting from "white flight," for it is clear that the substantial and intractable racial disparity in the listed schools existed from the *initial* implementation of the *1970* decree. In *Medley, supra,* rejecting a plan which relied heavily on geographic zoning, to the substantial exclusion of the more effective techniques set out in *Swann,* we held:

> In the light of the history of state-enforced segregation in the Danville schools, the marked residual disparity in the racial balance of the schools under the plan of the District Court strongly suggests that the plan is ineffective to attain an acceptable degree of realistic desegregation.

482 F.2d at 1063. We there also rejected, as we do here, any suggestion that plaintiffs were insisting "that each school should mirror the racial composition of the entire system," *Medley, supra,* at 1063, noting *Swann*'s observation that "[t]he court should scrutinize [predominantly one-race] schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part." 402 U.S. at 26, 91 S.Ct. at 1281.

Nothing on the record indicates that the 1970 assignments to the nine listed schools were not mere reflections of prior state-imposed segregation which was perpetuated by the ineffective freedom-of-choice plan.

■ As in *Medley* and earlier in *Adams v. School District No. 5, Orangeburg Co., S. C.,* 444 F.2d 99 (4th Cir.), *cert. denied, Winston-Salem/Forsyth County Board of Education v. Scott,* 404 U.S. 912, 92 S.Ct. 230, 30 L.Ed.2d 186 (1971), we find that the lower court, confronted in 1972 with a request, *inter alia,* for intradistrict relief, failed to give due consideration to "the use of *all* techniques for desegregation," as enumerated in *Swann. Adams,* 444 F.2d at 101 (emphasis added). We therefore remand for immediate formulation and implementation of a plan specifically directed at the "elimination of one-race schools," *Adams,* 444 F.2d at 101, and one which is generally aimed at achieving "the greatest possible degree of actual desegregation, taking into account the practicalities of the situation." *Davis v. Board of School Commissioners of Mobile County,* 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971).

## II.

The initial 1972 "Motion for Further Relief" named only the Durham City Board as a defendant. Having been granted a later motion to add the County Board, the County Board of Commissioners, the City Council, and the State Board of Education as defendants,[16] the plaintiffs then directed their supplemental complaint to the more drastic merger or "annexation" relief mentioned above. In the course of the trial (the city and county school cases having been consolidated), plaintiffs adduced evidence apparently showing that placement in 1972 of low-cost housing in the "City Out" area had created substantial racial imbalance in a few of the elementary schools. There is testimony by various city officials, including the city planner and the directors of the city's Housing Authority and Redevelopment Commission, tending to show little or no coordi-

---

16. Members of all defendant bodies were, in their official capacities, later made defendants under our decision in *Singleton v. Vance County Bd. of Educ.,* 501 F.2d 429 (4th Cir. 1974).

nation among the responsible officials to avoid that kind of impact.

Plaintiffs assert error in the failure of the lower court to grant future injunctive relief against the City or its various agencies with respect to the location of public housing projects. But we agree with the City Council's observation that neither were the appropriate city housing agencies (or members thereof) named nor was this particular issue more than subliminally before the court, given its primary focus on the prayers for drastic inter-district relief. As *Swann* has pointed out, "[o]ne vehicle can carry only a limited amount of baggage." 402 U.S. at 22, 91 S.Ct. at 1279.

Given the absence of any findings by the district court on this question, we think it inappropriate to do more than instruct the district court that on remand it should give plaintiffs the opportunity, if they are so advised, to file a complaint properly directed to the responsible officials. The district court can thereafter consider the propriety of future injunctive relief for the purpose of insuring that future housing projects have neither a resegregative purpose or effect.

*Affirmed in part, reversed in part, and remanded with instructions.*