Wilfred KEYES et al., Plaintiffs,

and

Congress of Hispanic Educators, et al., Intervenors,

v.

SCHOOL DISTRICT NO. 1, DENVER, COLORADO, et al., Defendants.

Civ. A. No. C–1499.

United States District Court, D. Colorado.

Aug. 25, 1977.

Patrick M. Westfeldt, Holland & Hart, Denver, Colo., for plaintiffs.

Remigio Pete Reyes, Denver, Colo., for intervenors.

William K. Ris, Bruce F. Fest, Wood, Ris & Hames, Denver, Colo., Michael H. Jackson, Denver Public Schools, Administration Dept., Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, District Judge.

The issue before the court concerns entitlement to attorneys' fees and costs arising from protracted litigation over segregation in the Denver, Colorado, public school system. The plaintiffs are parents of children attending Denver Public Schools and sue individually and on behalf of their minor children. The Congress of Hispanic Educators, as well as a number of Spanish-surnamed individuals, have been permitted to intervene to represent the particular in-

terest of the Hispano community. Defendants are School District No. 1 (Denver Public Schools or DPS), Denver, Colorado, and individual board members of that school district. As part of our ruling on the fees and costs issue, the court has considered the application for expert witness fees and expenses of Drs. George E. Bardwell and Paul D. Klite.

Plaintiffs and intervenors, after prevailing on the merits of their action, have asked the court to award reasonable fees pursuant to Section 718 of the Emergency School Aid Act of 1972, 20 U.S.C. § 1617, and the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. The claims for costs and other out-of-pocket expenses is based on 28 U.S.C. § 1920, Rule 54 of the Federal Rules of Civil Procedure, and upon the equitable power of the court to award costs incidental to attorneys fees.

## I.

The case was filed on June 19, 1969, when plaintiffs requested a preliminary injunction against defendant School District No. 1, claiming *de jure* segregation within the Denver public school system [DPS]. The history of the case can be traced through the many published opinions listed in the margin.[1] The lawsuit was vigorously litigated at every step, with multiple appeals to the Court of Appeals and the Supreme Court.

Upon remand from the Supreme Court, the trial judge concluded that the DPS was an unlawful dual system and thereby was in violation of the United States Constitution. D.C., 368 F.Supp. 207. After finding unacceptable the desegregation plans submitted by both plaintiffs and defendants, the trial court appointed its own expert, and thereafter approved a desegregation plan. D.C., 380 F.Supp. 673. A "final judgment" adopting a desegregation plan, and imposing a permanent injunction was entered in an unpublished opinion on April 17, 1974. *See also*, D.C., 380 F.Supp. 673. The plan was reviewed by the Tenth Circuit Court of Appeals, 521 F.2d 465, and *certiorari* was subsequently denied by the Supreme Court. 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657.

A final judgment on the merits has been entered,[2] and plaintiffs and intervenors now seek fees, costs, and expenses as prevailing parties from DPS under the statutes.

## II.

### A.

Defendants' most vigorous objection to any award of fees is based on the Eleventh Amendment to the Constitution of the United States. Defendants claim that the amendment is a bar to an award of monetary damages against a state or an agency of a state.[3] On the authority of *Edelman v.*

1. *Keyes v. School Dist. No. 1*, 303 F.Supp. 279 (D.Colo.1969); *Keyes v. School Dist. No. 1*, 303 F.Supp. 289 (D.Colo.1969); *Keyes v. School Dist. No. 1*, 396 U.S. 1215, 90 S.Ct. 12, 24 L.Ed.2d 37 (1969); *Keyes v. School Dist. No. 1*, 313 F.Supp. 61 (D.Colo.1970); *Keyes v. School Dist. No. 1*, 313 F.Supp. 90 (D.Colo.1970); *Keyes v. School Dist. No. 1*, 402 U.S. 182, 91 S.Ct. 1399, 28 L.Ed.2d 710 (1971); *Keyes v. School Dist. No. 1*, 93 S.Ct. 2686, 37 L.Ed.2d 548, 413 U.S. 189 (1973); *Keyes v. School Dist. No. 1*, 368 F.Supp. 207 (D.Colo.1973); *Keyes v. School Dist. No. 1*, 380 F.Supp. 673 (D.Colo. 1974); *Keyes v. School Dist. No. 1*, 521 F.2d 465 (10th Cir. 1975), *cert. denied*, 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657 (1976).

   Nearly all district court hearings, other than those on the issue of attorneys' fees were presided over by Judge William E. Doyle, who has since been elevated to the United States Circuit Court of Appeals for the Tenth Circuit.

2. "By final judgment we mean one where 'the availability of appeal' has been exhausted or has lapsed and the time to petition for certiorari has passed." *Bradley v. Richmond School Bd.*, 416 U.S. 696, 711 n. 14, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974).

3. Plaintiffs do not concede that the school district is an entity which may avail itself of the State's Eleventh Amendment immunity. Whether immunity extends to defendants is a matter of Constitutional and State law which we need not now decide. *See, Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Harris v. Tooele County School Dist.*, 471 F.2d 218 (10th Cir. 1973); *Hamilton Mfg. Co. v. Trustees*, 356 F.2d 599 (10th Cir. 1966); 13 Wright & Miller, *Federal Practice and Procedure*, § 352.4.

*Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), defendants maintain that any award of attorneys' fees would necessarily come from the revenues of the state and is thus barred.

While the Eleventh Amendment generally prohibits monetary awards against a state, it must be read in a manner consistent with the Constitution as a whole. In certain circumstances, the Constitution permits monetary awards against a state. This is one of those circumstances.

■ Section 5 of the Fourteenth Amendment provides that Congress shall have power to enforce the substantive clauses of the amendment by appropriate legislation. When acting pursuant to that affirmative grant of power, Congress is permitted to pass legislation which otherwise might run counter to constitutional limitations.

The Supreme Court, in *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), considered this issue, albeit in the context of an award of fees in Title VII of the Civil Rights Act of 1964 relating to employment discrimination. There the Court stated, at 456, 96 S.Ct. at 2671:

> . . . [w]e think that the Eleventh Amendment and the principle of state sovereignty which it embodies . . . are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment. . . . We think Congress may, in determining what is "appropriate legislation" for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts. [¶] Congress' exercise

of power in this respect [allowance of attorneys' fees] is also not barred by the Eleventh Amendment.

In finding a constitutional basis for the allowance of attorneys fees against the state, in *Fitzpatrick* there was agreement among the parties on a preliminary matter which is here contested. In *Fitzpatrick*, it was stipulated that in enacting the 1972 Amendment to Title VII Congress acted within its power under § 5 of the Fourteenth Amendment.[4] *Fitzpatrick, supra*, 427 U.S. at 453 n. 9, 96 S.Ct. 2666.

Defendants deny that § 718 of the Emergency School Aid Act of 1972, 20 U.S.C. § 1617,[5] was enacted pursuant to the enforcement clause of the Fourteenth Amendment. Instead, it is implied that 20 U.S.C. § 1617, as part of the overall 1972 educational amendments, was enacted pursuant to Congress' spending power.

Determining the basis for the enactment of § 1617 is somewhat difficult. While the 1972 Amendments to Title VI (of which § 1617 is a part) have extensive legislative history[6] information relating to the Constitutional basis of § 1617 is notably lacking. Even in a section-by-section review of the legislation, any reference to § 1617 is missing. *See 2 U.S.Code Cong. & Admin. News at 2563* (1972).

■ Although Congressional intent may not be revealed in the legislative history, the language of the statute leads to only one conclusion: that Congress based its decision to authorize an award of attorneys' fees against "a local educational agency [or] state", on the basis of its § 5 enforcement powers under the Fourteenth Amendment. No other construction of the basis for

---

4. Amendment 14, § 5, provides:
   The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

5. 20 U.S.C. § 1617 provides:
   Upon the entry of a final order by a court of the United States against a local educational agency, a State (or any agency thereof), or the United States (or any agency thereof), for failure to comply with any provision of this title or for discrimination on the basis of race, color, or national origin in violation of

Title VI of the Civil Rights Act of 1964, or the fourteenth amendment to the Constitution of the United States as they pertain to elementary and secondary education, the court, in its discretion, upon a finding that the proceedings were necessary to bring about compliance, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

6. *See, 2 U.S.Code Cong. & Admin. News*, p. 2462 (1972).

§ 1617 is logical, given the precise wording of that section.[7] It follows then that the Eleventh Amendment immunity argument is not supportable as an impediment in an award of fees under 20 U.S.C. § 1617. *Cunningham v. Grayson*, 541 F.2d 538, 543 (6th Cir. 1976).

Moreover, it has been questioned whether an award of attorneys' fees which are taxed as allowable costs, as § 1617 dictates, are a form of monetary award at all. *See Dowell v. Board of Education*, 71 F.R.D. 49, 57 (W.D.Okl.1976). There is, of course, no recognized immunity from a taxation of costs.

### B.

In addition to the Constitutional authority supporting an award of attorneys' fees under 20 U.S.C. § 1617, independent authority exists for fees under 42 U.S.C. § 1988, as amended in 1976 by the Civil Rights Attorney's Fees Awards Act.[8] The latter Act was enacted under Congress' Section 5 powers and as such, no serious immunity argument can be raised. *See Sen.Rep. No. 94–1011, supra* at 5, U.S.Code Cong. & Admin. News 1976, p. 5908; *Fitzpatrick v. Bitzer, supra; Finney v. Hutto*, 548 F.2d 740 (8th Cir. 1977); *Bond v. Stanton*, 528 F.2d 688 (7th Cir. 1976). Thus, we find no support for defendants' argument that an award of attorneys' fees is barred by the Eleventh Amendment.

### III.

■ The terms of 20 U.S.C. § 1617 and 42 U.S.C. § 1988 permit attorneys' fees to be awarded to the prevailing party. Plaintiffs prevailed at the preliminary and permanent injunction stages and before the Supreme Court.

We find that plaintiffs were prevailing parties in this lawsuit. They were successful, in the face of extreme opposition, in establishing that DPS constituted and perpetuated an unconstitutional dual educational system.

■ Defendants note that neither plaintiffs nor the intervenors were successful in having their desegregation plans totally accepted by the court (neither, incidentally, was that of defendants). The fact that plaintiffs and intervenors have not prevailed on all issues does not, in itself, prohibit the award of fees, at least under 42 U.S.C. § 1988. *See Sen.Rep. No. 94–1011, 94th Cong., 2d Sess.* (June 29, 1976) at 5; *Note, The Civil Rights Attorneys' Fees Awards Act of 1976*, 34 Wash. & Lee L.Rev. 205, 219 (1977). Prevailing on every issue presented in a complaint is not necessary to enable a litigant to receive an award of attorneys' fees. *Cf.*, Dawson, *Lawyers, and Involuntary Clients in Public Interest Litigation*, 88 Harv.L.Rev. 849, 893 (1975).[9] Indeed, in some cases litigants have been considered prevailing parties where they did not prevail in the lawsuit, but were catalysts which forced defendant to modify its procedures in a manner sought through the litigation. *Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421 (8th Cir. 1970). *Accord, Reed v. Arlington Hotel Co., Inc.*, 476 F.2d 721 (8th Cir. 1973), and *Bowie v. Weinberger*, unpublished, Civ.No. 74–1801 (D.D.C. June 18, 1975).[10]

---

7. *Senate Report No. 94–1011*, 94th Cong. 2d Sess. (1976), page 5 refers to § 5 powers and speaks of 20 U.S.C. § 1617.

8. "In any action or proceeding to enforce a provision of sections [42 U.S.C. §§ 1981–83, 1986], [20 U.S.C. §§ 1681 et seq.], or in any civil action or proceeding by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the United States Internal Revenue Code, or Title VII of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

9. In considering attorney fee awards in desegregation cases, other civil rights fee statutes and case law may be consulted. *See, Bradley v. Richmond School Board*, 416 U.S. 696, 719, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1976).

10. The "catalyst" theory is not necessary for an award in this case and the court does not necessarily ascribe to it at this time. *Cf., Pearson v. Western Electric Co.*, 542 F.2d 1150, 1153 (10th Cir. 1976).

Professor Moore notes that in the taxation of costs "although a plaintiff may not sustain his entire claim, if judgment is rendered for him he is the prevailing party." 6 J. Moore, *Federal Practice* ¶ 54.70[4] at 1308–9. Elsewhere it is stated that an intervening plaintiff has the same entitlement as the original plaintiff to an award of costs. *Id.* at 1310–11. *See also, Parker v. Matthews*, 411 F.Supp. 1059, 1061 (D.C. 1976) (where the court analyzes the problem of identifying a prevailing party where there is a settlement rather than a judgment of the court) and *Foster v. Boorstin*, 555 F.2d 340 (D.C.Cir. June 30, 1977).

The statutes involved allow the court to award attorneys' fees as part of the costs. 20 U.S.C. § 1617; 42 U.S.C. § 1988. Using the traditional costs analysis and the overall contours of the results achieved, we find that intervenors are prevailing parties.

Some courts have discounted requests for attorneys' fees by an amount comparable to the extent to which parties did not prevail. *E. g., Schaeffer v. San Diego Yellow Cabs, Inc.*, 462 F.2d 1002, 1008 (9th Cir. 1972); *Armstead v. Starkville Mun. Sep. School Dist.*, 395 F.Supp. 304, 312 (N.D.Miss.1976); *Chance v. Board of Examiners*, 70 F.R.D. 334 (S.D.N.Y.1976). While certain jurisdictions have rejected this position, *Stanford Daily v. Zurcher*, 64 F.R.D. 680 (N.D.Cal. 1974),[11] the Tenth Circuit has adhered to the reduction rule. In *Pearson v. Western Electric Co.*, 542 F.2d 1150, 1153 (10th Cir. 1976), the court stated:

> It is only when a party has prevailed in a court action that he may be entitled to attorney's fees *proportionate to the extent of his recovery*. *Williams v. General Foods, Corp.*, 492 F.2d 399, 409 (7th Cir. 1974); *Schaeffer v. San Diego Yellow Cabs, Inc.*, 462 F.2d 1002, 1008 (9th Cir. 1972). (emphasis added).

Thus, we are of the view that attorneys fees should be awarded to plaintiffs and intervenors but that awards should be limited to the extent to which they prevailed in this litigation.

The mechanical aspects of compiling and analyzing pupil statistics and demographic realities was accomplished by plaintiffs prior to the formulation of a definitive desegregation plan. This compilation certainly assisted plaintiffs in the litigation.

On the other hand, much of the intervenors' work was associated with the submission of a desegregation plan. As noted, none of the specific plans submitted by the litigants was ultimately adopted by the court. The nature of the litigation does not lend itself to complete success by one side or the other. Nonetheless, the study, preparation and development of the plan which was eventually approved by the court depended to a large extent upon the proposals submitted by the parties. There is no exact yardstick by which the contribution of plaintiffs and intervenors can be measured. However, in our view, the contribution of both plaintiffs and intervenors was substantial. Without the participation of the Congress of Hispanic Educators, the School District's largest minority group would have gone unrepresented. Their involvement assured a fair and balanced presentation of the various views, was important to the success of desegregation, and contributed to the acceptance of the plan by the Hispano community. Their participation was encouraged by the trial court, and efforts by attorneys of the Congress in the case were of the highest caliber. The Congress of Hispanic Educators are a prevailing party in this litigation. After reviewing the record in this action, and noting that the "Cardenas plan" put forth by intervenors was rejected as a "complete solution," we find that intervenors prevailed to an extent of 85% of recovery requested by them. Accordingly, after determining an appropriate fee, an award to intervenors will be reduced by 15%. For a similar reason, the award to plaintiffs shall also be reduced. As mentioned, however, the bulk of plaintiffs' work

---

11. The conflict between *Stanford Daily* (N.D. Calif.1974) and *Schaeffer* (9th Cir. 1972) would be easy to resolve were it not for the Ninth Circuit per curiam affirmance of *Stanford Daily* where the court stated, without mentioning *Schaeffer*: "We adopt the opinion of the district court . . . ." *Stanford Daily v. Zurcher*, 550 F.2d 464 (9th Cir. Feb. 2, 1977).

was accomplished prior to the call for submission of desegregation plans. Thus, the fee award to plaintiffs will be reduced by only 5%.

### IV.

■ We have considered and reject defendants' argument that relief is not available under 20 U.S.C. § 1617 and 42 U.S.C. § 1988 since this litigation commenced in 1969, years before the fee statutes were enacted. The Supreme Court laid to rest defendants' argument in *Bradley v. Richmond School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). *See also Cunningham v. Grayson*, 541 F.2d 538 (6th Cir. 1976); *United States v. School Board*, 418 F.Supp. 639, 648 (E.D.Va.1976); and *Chance v. Board of Examiners*, 70 F.R.D. 334, 340 (S.D.N.Y.1976), where the courts approved of the retroactive application of § 1617.

Applying the same reasoning used in regard to § 1617, there seems no purpose in denying a retroactive application for the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988. In approving the retroactive application of 20 U.S.C. § 1617, the Supreme Court stated:

> We anchor our holding in this case on the principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary.

*Bradley, supra* 416 U.S. at 711, 94 S.Ct. at 2016. The statute is silent as to the retroactive effect of the 1976 amendment to 42 U.S.C. § 1988. The legislative history, however, is replete with comments concerning the liberal interpretation of fees statutes in civil rights cases, and references to *Bradley, supra.* Thus, there is support of our view that the letter and spirit of the law renders the 1976 Civil Rights Attorney's Fees Awards Act applicable to the present case. The 1976 Act, like 20 U.S.C. § 1617 was meant to have retroactive effect.[12]

### V.

■ To support an award under 20 U.S.C. § 1617, it must be demonstrated that proceedings were necessary to bring about compliance with the law. No such finding is needed when awarding fees under 42 U.S.C. § 1988. In this case the distinction is of little consequence because it is clear that the institution of the lawsuit *was* necessary to end *de jure* segregation in the Denver public schools. The filing of the complaint in this case in July of 1969 was in response to the school board's rescission of resolutions dealing with education integration enacted by previous school boards.

The Tenth Circuit Court of Appeals in its most recent pronouncement in this litigation, characterized the attitude of the litigants as one of "typical inflexibility." 521 F.2d 465, 468 (10th Cir. 1975). Defendants resisted the attempts of plaintiffs and intervenors to integrate the Denver school system. It is inconceivable that without the impetus of this lawsuit, Denver would have the present integrated school district, as mandated by constitutional considerations. Even at this stage of the proceedings defendants resist the fact that plaintiffs and intervenors are entitled to attorneys' fees. The instant lawsuit was necessary to bring defendants into compliance with the law; and we so find.

### VI.

#### A.

Having determined that plaintiffs and intervenors are entitled to reimbursement for attorneys' fees, we turn to the appropriate amount of such fees.[13]

---

12. Retroactive application of § 1988 was recently approved in *Beazer v. New York City Transit Authority*, 558 F.2d 97 (2d Cir. 1977); *Norwood v. Harrison*, 410 F.Supp. 133 (N.D. Miss.1976) and *Wade v. Mississippi Co-Op*, 424 F.Supp. 1242 (N.D.Miss.1976).

13. A total of $844,812 in attorneys' fees, costs and expenses is requested, divided as follows. Fees: Holland & Hart–$474,972; Craig S. Barnes–$58,125; NAACP–LDF–$97,112; MAL-DEF–$49,681; Costs and Expenses: Holland & Hart (on behalf of all plaintiffs)–$152,989; MALDEF–$10,933.

The Supreme Court of the United States has ruled that in school desegregation cases "the successful plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" *Northcross v. Board of Education*, 412 U.S. 427, 428, 93 S.Ct. 2201, 2202, 37 L.Ed.2d 48 (1973). While certain "special circumstances" may require adjustment of the amount of the award, none exist here justifying denial of any award.

■ By the terms of 20 U.S.C. § 1617 and 42 U.S.C. § 1988, it is clear that any award of attorneys' fees is a matter addressed to the sound discretion of the court. *Cf., Silver v. Cormier*, 529 F.2d 161 (10th Cir. 1976); *Brito v. Zia Co.*, 478 F.2d 1200 (10th Cir. 1973); *Barela v. United Nuclear Corp.*, 462 F.2d 149 (10th Cir. 1972); *Kelly v. Guinn*, 456 F.2d 100 (9th Cir. 1972). The amount of any allowance is determined by the facts in each case. *Steele v. Title Realty Company*, 478 F.2d 380 (10th Cir. 1973); *Featherstone v. Barash*, 382 F.2d 641 (10th Cir. 1967). In certain circumstances, the court is justified in refusing to award any fees at all. *Silver v. Cormier, supra.*

■ There is no fixed standard or guide by which the court can determine reasonable attorneys' fees. *Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597 (D.Colo.1974). The entire litigation must be considered and evaluated to arrive at a just allowance, fair to all parties.

### B.

Notwithstanding the absence of an exact standard for fees, the following criteria are helpful in our determination: [14]

    (1) Nature and extent of objections, if any, to allowance of fees;

    (2) Magnitude, complexity and novelty of the litigation—legal questions presented and the state of the law;

    (3) Benefit to plaintiffs as a result of the litigation—results achieved;

    (4) Assistance, if any, from governmental agencies or other related proceedings;

    (5) Court's knowledge of the nature, extent and quality of services rendered by counsel;

    (6) Responsibility undertaken by class counsel—risks involved and inherent preclusion of other employment;

    (7) Popularity of the cause—affect on counsel's professional standing;

    (8) Fee arrangements among counsel and members of the class;

    (9) Time and effort expended by counsel in the litigation;

    (10) Awards in other public interest cases;

    (11) Other considerations;

    (12) The public or private nature of the entity paying the award of fees;

    (13) Public Policy.

Obviously, some categories overlap. However, by individual analysis all important elements will be covered.

### (1) NATURE AND EXTENT OF OBJECTIONS, IF ANY, TO ALLOWANCE OF FEES

In addition to constitutional and legal objections to fees discussed *supra*, defendants raise objections to awards for various types of reimbursements and for certain hourly charges included in the application for fees.

Defendants' objections to fees include the following: unnecessary duplication of effort and unrelated activities; attorneys performing paralegal, ministerial or other duties; time spent at school board meetings and dealing with press and community relations; time spent on recovering the fee award; time spent on losing contested issues and intervenor matters; for travel time; and continuing legal education. In addition, defendants resist the applications

14. In fee award cases the courts have established varied criteria for use in determining appropriate awards. The touchstone for the various formulations is contained in Disciplinary Rule 2–106 of the Code of Professional Responsibility, which provides assistance to counsel in setting a proper fee. DR–2–106 was adopted by the Supreme Court of the State of Colorado on August 20, 1970, and adopted by this federal court in Local Rule of Practice 1[f].

insofar as they request fees for expert witnesses and for costs not normally recompensable under 28 U.S.C. § 1920.

## (2) MAGNITUDE, COMPLEXITY AND NOVELTY OF THE LITIGATION— LEGAL QUESTIONS PRESENTED AND THE STATE OF THE LAW

## (3) BENEFIT TO PLAINTIFFS AS A RESULT OF THE LITIGATION— RESULTS ACHIEVED

This was a highly complex case, both from a factual and legal standpoint. *Keyes v. School District No. 1.*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), was the first desegregation case outside of the South which found *de jure* segregation to exist in the absence of a state statutory or constitutional provision requiring segregated facilities. In *Keyes* the Court accepted plaintiffs' theory that administrative action can constitute *de jure* segregation.

The burden on plaintiffs to prove intentional acts of segregation affecting the entire school district was formidable. The Supreme Court recently recognized the enormity of the task in *Dayton Board of Education v. Brinkman*, —— U.S. ——, ——, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977). In *Keyes*, the burden necessitated the collection and collation of school assignment patterns and school segregation patterns over a 20 year period. In many instances, such information had never been gathered, and data had to be amassed from sources such as school yearbooks, newspaper articles and scrapbooks maintained by private persons. The data assembled was processed into usable form and entered into a computer data bank through a computer program specifically developed for the litigation. The development and presentation of the evidence, covering a 20 year period and examining every aspect of a school district of nearly one hundred schools and (then) over 90,000 pupils, underscores the difficulty and complexity of the litigation.

Without the assistance of definitive precedent, the original court complaint was drafted not in accordance with existing law, but what the law should be in order to comport with principles of the Fourteenth Amendment. When this case was commenced, no court had granted the relief sought, and the course traversed by plaintiffs was beset by factual obstacles on all fronts. Indeed, the results achieved are significant, and all subsequent school desegregation cases have followed the pathways ' established in *Keyes*. The *Keyes* litigation and results achieved required a complete educational restructuring of the public school system. Nearly a decade later, it continues to have a forceful impact in the Denver community.

## (4) ASSISTANCE, IF ANY, FROM GOVERNMENTAL AGENCIES OR OTHER RELATED PROCEEDINGS

In several subsequent school desegregation cases, there was involvement by federal agencies on behalf of movants. In those cases governmental resources assisted the prosecution of the case. In *Keyes*, however, plaintiffs had to proceed without governmental assistance.

## (5) COURT'S KNOWLEDGE OF THE NATURE, EXTENT AND QUALITY OF SERVICES RENDERED BY COUNSEL

■ One of the factors which contributes to the trial court's evaluation of attorney's services is the quality of the work which the judge has observed. *Lindy Bros. Builders v. American R. & S. Standard Corp.*, 487 F.2d 161 (3d Cir. 1973); *Freeman v. Ryan*, 133 U.S.App.D.C. 1, 408 F.2d 1204 (1968); *In re King Resources Co. Securities Litigation*, 420 F.Supp. 610, 635 (D.Colo.1976). As noted in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 718 (5th Cir. 1974):

> The trial judge should closely observe the attorney's work product, his preparation, and general ability before the court. The trial judge's expertise gained from past experience as a lawyer and his observation from the bench of lawyers at work become highly important in this consideration.

When a trial judge has observed the day to day work of attorneys, their responsiveness to the needs of the judicial system and their overall professionalism, he brings a special expertise to the issue of counsel competence. In this case, however, the trial court judge who shepherded this case to final judgment is not adjudicating the fee award request. This judge has neither presided over any substantive hearings nor is presently engaged in monitoring the progress of the desegregation plan adopted by the court. While these facts make the chore more difficult, we are nonetheless able to render an informed opinion on the subject.

We have reviewed the voluminous pleadings filed with the court, the Court of Appeals, and the Supreme Court. In establishing their case for fees and expenses, plaintiffs and intervenors have presented a number of witnesses who are in agreement that the advocacy in this litigation has been of the highest order. We acquiesce in that evaluation.

Plaintiffs have been represented, in the main, by a partner in the law firm of Holland and Hart [H&H], one of Colorado's largest law firms. Counsel was assisted by attorneys from the Legal Defense Fund [LDF] of the National Association for the Advancement of Colored People who are nationally recognized experts in the field of school desegregation. Intervenors were represented by lawyers from the Mexican-American Legal Defense and Educational Fund [MALDEF]. MALDEF has been involved throughout the United States in education litigation on behalf of Hispano students and has brought their expertise to bear in representation of Hispano students in the Denver school system.

Over the years, we have had the opportunity to observe Colorado counsel in connection with other cases before the federal and state courts. From those observations and the excellent work products reflected in court documents in this case, it is clear that all attorneys performed in a thorough, dedicated and professional way.

**(6)  RESPONSIBILITY UNDERTAKEN BY CLASS COUNSEL—RISKS INVOLVED AND INHERENT PRECLUSION OF OTHER EMPLOYMENT**

(a) Over 70% of the 11,441 [15] hours expended by counsel for plaintiffs and intervenors was accomplished by attorneys in private practice. Attorney Craig Barnes, of Denver, was responsible for approximately 10% of the total attorney hours expended in this litigation. His risk of non-compensation for his services was limited, however, by an agreement with the Denver Equal Education Opportunity Fund, Inc., a group organized to help finance plaintiffs' case.[15a] He was, however, a sole practitioner in the early stages of the litigation and had little, if any, partner backup in other cases while occupied with Keyes.

Private-practice counsel was also provided by Holland and Hart. Attorney Gordon Greiner (a H&H partner) provided the lion's share of time expended in the case—approximately 63% of the 11,441 total hours. In 1969, Mr. Greiner accepted the case with full knowledge of its magnitude and potential impact, and recognized the degree of opposition that was likely.

At the time the suit was commenced, a decision was made by H&H to permit Mr. Greiner to act as lead counsel for the case on a *pro bono publico* basis. Mr. Greiner was to have access to the manpower and physical assets of the H&H firm, but was to sign pleadings individually and not connect the name of the firm with the litigation. Recently, however, H&H allowed its firm's name to be entered on pleadings signed by Messrs. Greiner and Robert Connery.

Only after litigation commenced was the original complaint amended to include a prayer for attorneys' fees. Thus, the risk factor, in the sense considered in a fee analysis that counsel would go uncompensated was not a consideration in H&H's original decision to participate.

---

**15.** Attorney hours for which compensation is requested follows in subsection nine (9).

**15a.** That agreement is considered in a subsequent portion of this opinion.

(b) As noted, additional legal assistance was provided by public interest litigation groups, namely LDF and MALDEF. To these groups the concept of "risks involved" and inherent preclusion of other employment, as used in the usual sense, have no real significance. LDF and MALDEF exist for the express purpose of participating in school desegregation litigation and are funded for that purpose through private sources. The risks in this particular litigation were similar to the risks in other cases accepted by the two legal units. We are persuaded that LDF and MALDEF are entitled to an award of attorney fees and we reject contentions to the contrary.

## (7) POPULARITY OF THE CAUSE—EFFECT ON COUNSEL'S PROFESSIONAL STANDING

To a large extent, the popularity of the cause varies with the viewpoint of the observer. To some Denver residents, this case represented a medium through which attention could be drawn to the unlawful *de jure* segregation which existed, and presumably still exists, throughout the Northern and Western states. Others in the community saw the litigation as a threat to the concept of neighborhood schools and education itself. In any event, the Denver area was divided by the controversial *Keyes* litigation and in some quarter, the case prompted public outcry, condemnation and unpopularity. The various educational enforcement plans supervised pursuant to court order continue to be of great public concern. Counsel for plaintiffs' and intervenors, through their dedicated performance in this unpopular cause have surely fulfilled the calling recognized by the American Bar Association Joint Conference on Professional Responsibility when it stated:

> One of the highest services the lawyer can render to society is to appear in court on behalf of clients whose causes are in disfavor with the general public.

*Professional Responsibility: Report of Joint Conference,* 44 A.B.A.J. 1159, 1216 (1958).

## (8) FEE ARRANGEMENTS AMONG COUNSEL AND MEMBERS OF THE CLASS

### A.

None of the law offices requesting an award of fees and expenses had any agreement with members of the class respecting payment by the class. Nor was evidence presented concerning any arrangement among counsel themselves. As to the named plaintiffs and the class generally, all counsel agreed to perform their services on a *pro bono publico* basis. However, we note that there was an agreement between Craig S. Barnes and the Denver Equal Education Opportunity Fund, Inc. [DEEOF].

The DEEOF was incorporated in June of 1969, one month prior to the filing of the Keyes complaint. While the corporate purpose of the DEEOF is stated in general terms, its sole function to date has been partial funding of this case. The DEEOF has paid certain sums to H&H and Craig S. Barnes as reimbursement for out-of-pocket expenses. In addition, the DEEOF entered into an agreement with Mr. Barnes whereby it would compensate him at a rate of $30.00 per hour for work accomplished on the Keyes case.[16] Mr. Barnes practices with one partner, and without the assistance of the DEEOF it is unlikely that he would have been able to participate in the case. Under the agreement, Mr. Barnes was paid $28,600 by the DEEOF. It has been represented to the court that this amount will be returned to DEEOF upon our fee award. Plaintiffs' *Memorandum of Law in Support of Allowance of Attorneys' Fees and Expenses of Plaintiffs' Class,* at 28.[17]

At the time of attorney Gordon Greiner's initial appearance in the case, his law firm recognized the magnitude of the litigation.

---

**16.** At the fee hearing Mr. Barnes testified that his usual hourly rate at the time of the DEEOF agreement varied between $35 and $40.

**17.** The *Memorandum* at 28 also provides that the amounts returned to DEEOF will be used to defray non-taxable costs and expenses of the lawsuit.

Nonetheless, H&H agreed to proceed *pro bono publico*. At a meeting of the H&H Executive Committee, with 19 members of the firm present, it was decided that Mr. Greiner

> was authorized to undertake the position of lead counsel in the proposed action against the Denver School Board involving the Board's June 9 recission in action and de facto [sic] school segregation in Denver. This undertaking would be on a priority basis and without compensation to the firm. GG Greiner would have discretion in utilizing interested H&H partners and associates, also on a pro bono publico basis, to assist in the effort.
>
> . . .

Minutes, Executive Committee, June 12, 1969 (Def's Ex. B.)

At our hearing on fees, prominent members of the Colorado Bar testified that if they originally accepted representation on a *pro bono* basis, they would feel ethically and professionally obligated to refrain from seeking any fee award whatsoever. This view was expressed even in the face of subsequently enacted statutes authorizing an award of fees from defendant. These witnesses also pointed out that there is a *pro bono* aspect to representation in cases as the instant one. This *pro bono* aspect suggests that legal services should be rendered by attorneys in some cases without regard to exacting a full measure of attorneys' fees that would prevail in other litigation.

Defendants' argument of non-entitlement to fees is pressed against Craig Barnes, as well, on the basis that he agreed to charge the class nothing for his services and is under no obligation to reimburse DEEEOF for the funds received from it. The *pro-bono* contention is likewise asserted against LDF and MALDEF.

■ The fact that LDF and MALDEF accepted employment on a *pro bono* basis is not determinative of fee entitlement. Given the public interest nature of these law firms, it is unlikely that their representation would be other than without cost to their clients. Nussbaum, *Attorney's Fees*

*in Public Interest Litigation,* 48 N.Y.U.L. Rev. 301, 305–11 (1973). LDF and MALDEF normally cannot expect reimbursement for professional services other than by court awarded attorneys' fees in public interest cases. To say that they should not be granted statutory fee awards in a proper case is to hamper seriously these public interest *pro bono* efforts.

The argument against fee entitlement advanced by defendants has more force with respect to the private law firms. At the time the complaint was filed in 1969, it contained no prayer for a fee (it was subsequently amended). When employment was accepted the various attorneys involved had no expectation of reimbursement for their services, but this fact did not dissuade them from bringing suit. DPS argues that neither the fee award statutes later enacted nor the possibility of equitable awards influenced the filing of this lawsuit. It is argued that the very purposes of the fee statutes (to encourage legal enforcement of constitutional rights) did not come into play in this case.

■ We reject defendant's argument on this point. Legally speaking, there is nothing inconsistent in prosecuting a case in the public interest, agreeing not to charge one's *own* client a fee and thereafter seeking fees from other litigants. *See Miller v. Amusement Enterprises, Inc.,* 426 F.2d 534, 538–39 (5th Cir. 1970).

While members of the legal profession may question the propriety of requesting a fee under such circumstances, there is no legal impediment to an award of fees in this case.

In addition, we consider it unimportant in our determination that a portion of plaintiffs' and intervenors' services were performed by a legal aid or public interest law firm. *Fairley v. Patterson,* 493 F.2d 598, 606 (5th Cir. 1974); *Swann v. Charlotte-Mecklenburg Bd. of Educ.,* 66 F.R.D. 483, 486 (W.D.N.C.1975). In this connection, the amount of attorneys' fees awarded is not dependent upon the fee agreed upon by a party and his counsel. The fact that coun-

sel has agreed to pursue a cause without charging a fee should have no effect on the court's judgment to award a fee. *Clark v. American Marine Corp.,* 320 F.Supp. 709, 711 (E.D.La.1970). In fact, some courts have ruled that it is an abuse of discretion to fail to award fees when a case is accepted *pro bono publico. See* discussion in *Wallace v. House,* 377 F.Supp. 1192, 1204 (W.D. La.1974). In sum, we hold that the fact that the case was accepted *pro bono publico* is not a bar to an award of reasonable attorney fees. *Torres v. Sachs,* 538 F.2d 10 (2d Cir. 1976). Parenthetically, we note that when no fee is charged the fee arrangement factor in determining an award is of no assistance to the court in establishing a fair award.

Further, the very fact that Congress passed § 1617 and amended § 1988 is an indication that fees should be granted even when cases are accepted *pro bono publico.* Surely Congress recognized the reality that most school desegregation cases are commenced without the expectation of receiving a fee from one's class action clients. Fees would be awarded infrequently if the *pro bono* aspect of a fee arrangement is determinative as to whether a fee should be awarded. Such a circumstance would go against the realities seen by Congress in enacting fee award statutes and against the expression of the Supreme Court when it said that in education-related cases a fee should ordinarily be awarded, unless special circumstances exist. *Northcross v. Board of Education,* 412 U.S. at 428, 93 S.Ct. 2201.

### (9) TIME AND EFFORT EXPENDED BY COUNSEL IN THE LITIGATION

Litigation time expended by counsel for plaintiffs and intervenors is prodigious and applications for compensation totalling 11,-441 hours have been filed.[18] The hours, divided according to different billing rates suggested in the application, are as follows:

| | | |
|---|---|---|
| Holland & Hart | 7,916 | hours |
| Craig S. Barnes | 1,182 | |
| NAACP Legal Defense Fund | | |
| (senior attorneys) | 1,053 | |
| (other attorneys) | 362 | |
| MALDEF | | |
| (in-court) | 133 | |
| (out-of-court) | 795 | |
| TOTAL | 11,441 | hours |

Neither Craig Barnes, H&H, nor LDF, made distinctions in their applications among types of services provided (*e. g.* in-court, out-of-court, etc.). MALDEF made that distinction. MALDEF also suggested a single rate regardless of the experience of the attorney rendering any service.

#### (a) *Holland & Hart*

Of the 7,916 hours claimed by H&H attorneys, defendants admit the reasonableness of 6,737 of those hours. Defendants dispute the reasonable necessity of the remaining 1,179 hours. We find 636 hours excessive or non-compensable. This leaves 7,280 hours subject to our fee determination. The disputed hours are divided into various categories.

*Unnecessary duplication of effort—81 hours*

In *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir. 1974), the court stated:

> If more than one attorney is involved, the possibility of duplication of effort along with the proper utilization of time should be scrutinized. The time of two or three lawyers in a courtroom or conference when one would do, may obviously be discounted.

*See also, Ward v. Kelly,* 515 F.2d 908 (5th Cir. 1975); *Clanton v. Allied Chemical Corp.,* 416 F.Supp. 39 (E.D.Va.1976); *Thompson v. School Board,* 363 F.Supp. 458 (E.D.Va.1973).

Of the 81 hours contested, defendants do not dispute any time billed by any of the three lead counsel,[19] even when all three were present at one time. Additional hours

---

**18.** Fractions of hours have been omitted. In some cases, therefore, figures may not total precisely.

**19.** Craig S. Barnes, Gordon Greiner, and James Nabrit of the LDF.

by other associated counsel have been questioned, including one entry described as "Admission to Ct. of App." After reviewing the disputed time we disallow 21 hours as unnecessary duplication.

### Attorneys performing paralegal work or nonlegal work—25 hours

■ In the instant case, the H&H law firm has no serious problem of non-professional help to accomplish certain secretarial and messenger-type services. The great majority of time in this category consists of items such as *travel time, to file pleadings or pick up orders.* The majority of the entries include blocks of time of 15 minutes or less.[20] Notwithstanding the minimal time included in each entry, the number of entries is large enough to result in 25 billable hours. We find none of these hours falling within the category of legal work, and deduct them from the total requested. *See Georgia Highway Express, Inc., supra.*

### Attendance at school board meetings—27 hours

■ Plaintiffs' counsel attended a number of school board meetings during the pendency of the lawsuit. The purpose was to monitor the activities of the school board for later use at trial. Essentially, counsel performed in the role of an investigator in pursuing this activity. While it cannot be denied that personal knowledge of school board actions during the pendency of this lawsuit was helpful to counsel, the real question is whether it was reasonably necessary to the proper progression of the lawsuit. We conclude that these 27 hours were not reasonably necessary for representation in the case and are deducted from the H&H request.

### Press relations—46 hours

■ We find that there are 17 billable hours in this category. Over the eight year history of this litigation the news media has been, and remains, interested in the progression of the case. Counsel participated in numerous media interviews and community service programs and itemizes 46 billable hours for this purpose. Counsel for plaintiffs observes that in a case of such importance as this, the public benefits from accurate reporting of developments in the case by the news media. We do not doubt that. Nonetheless, this court's function is to determine what portion of plaintiffs' and intervenors' fee applications was reasonably necessary for the proper prosecution of the lawsuit.

This is a class action lawsuit. Unlike many class actions, such as in the securities areas, the nature of the relief to be sought is not obvious absent contact with many members of the class. While plaintiffs' counsel originally represented all minorities within the school district, the fact that the trial court encouraged the participation of intervenors to represent the Hispano portion of the class demonstrates the difficulty counsel had in reaching some components of the class. In this regard, the news media provides a valuable conduit of information between counsel and the class.[21] We consider as reasonably necessary only those discussions with the press that contributed to communication with the class in a *meaningful* way and were necessary for the prosecution of the suit. This, of course, is difficult to determine from the court record. Some items are easily discounted since they relate to interviews granted reporters from out-of-state newspapers. Others are more difficult. Nonetheless, in the exercise of our discretion, the court finds as reasonably necessary 17 of the 46 hours requested. These represent time spent on community service programming of some length, and where the intricacies of the complex issues involved could be clearly and fully explained to members of the class.

### Attendance at community meetings—92 hours

■ As discussed previously, we cannot fault counsel for desiring to communicate

---

20. We note in passing that H&H offices are two blocks from the United States Courthouse.

21. In most class actions having economic effect the courts usually insist that the media be used, by way of paid advertisements or otherwise, to ensure communication with the class.

with the class. Attendance at community meetings concerning the nature of the lawsuit (40 hours) and meetings regarding the desegregation plans (52 hours) was, in general, reasonably necessary for the proper prosecution of the case. The hours claimed are considerable but the issues were complex and the community impact substantial. From the documents submitted, however, some excess is present, and accordingly, we deduct 7 hours. These involve, among other things, meetings relating to fund raising drives and conferences concerning a comparison of conditions in Denver and Boston, Massachusetts.

### Time spent on losing issues and intervenor matters—94 hours

Defendants complain of the time plaintiffs' counsel expended on legal theories and desegregation plans which were not accepted by the court. This actually relates to the proportionate recovery doctrine adopted in *Pearson v. Western Electric Co.*, 542 F.2d 1150 (10th Cir. 1976), and discussed earlier.

Defendants object to time spent in responding to discovery requests made by intervenors to plaintiffs. Upon their late entry in the case, intervenors required a certain degree of discovery in order to determine the best course to pursue. The amount of discovery was not excessive and in our view the intervenors exercised restraint in making discovery requests. Thus, we find no basis for deducting any of this disputed time.

### Travel Time—140 hours

█ During this case, plaintiffs' counsel have amassed 140 hours in travel time and desire to bill such time at their full rate.[22] The courts have approached the issue of travel time in different ways. Some courts have held that time involved in going to and from one place to another is reasonably necessary to the litigation and have compensated counsel. Others have refused reimbursement completely. *Norwood v. Harrison*, 410 F.2d 133, 142 n. 10 (N.D.Miss. 1976). Still other courts have compensated counsel for travel time but, considering the lessened legal efficiency, have done so at a rate below the normal hourly rate requested. *Davis v. Reed*, 72 F.R.D. 644 (N.D.Miss. 1976).

The last option is the most realistic. In complex cases, attorneys occasionally find the need to collaborate with experts living in other parts of the country. In this case, the testimony revealed that the trips were for the purpose of consultation and preparation of briefs, petitions, and other pleadings. Defendants do not object to the time spend in preparation of materials, only the time used in traveling to other cities across the nation.

The exhibits indicate nine trips to New York City, and one each to Chicago, Washington, and Miami. Certain of the trips were related to seminars (considered below), and therefore were not reasonably necessary for the litigation. We credit counsel with nine hours for each round trip to New York, Washington, and Miami which dealt with non-seminar matters, and six hours for the round trip to Chicago. This totals 96 hours.

In awarding fees, it has been suggested that courts consider not only the number of hours involved but the nature of the work accomplished during those hours. For example, courtroom work is often recompensed at a higher rate than discovery work. *Lindy Bros. Builders, Inc. v. American R. & S. Standard Corp.*, 487 F.2d 161 (3rd Cir. 1973); Hammond, *Stringent New Standards for Awards of Attorney's Fees*, 32 The Business Lawyer 523 (1977).

In the case of time billed for airplane flights, we award only one-half of the normal office rate for these 96 hours. *See Davis v. Reed, supra.* For ease of calculation, however, we have awarded the full rate, but cut by one-half the hours awarded

---

**22.** The 140 hours does not include the time spent at the destination.

in this category. Thus, of the original 140 hours requested, we approve 48.[23]

*Continuing Legal Education—24 hours*

▆ Mr. Greiner attended two legal seminars for which he seeks his hourly rate. The first seminar took place in Washington D.C. over a two day period in 1972. The second comprised of one day in New York City in late 1975. We decline to approve hours in this category. These hours were not reasonably necessary for representation in this case.

*Time spent on recovering the fees and costs—505 hours*

▆ Plaintiffs' counsel has spent 505 hours in litigation over the issue of fees and costs. We approve 125 hours. Initially, defendants denied that any time devoted to the pursuit of fees and costs can be the subject of this court's award. Certain courts have simply refused to award any sums as compensation for time spent in pursuit of fees. *Latham v. Chandler*, 406 F.Supp. 754 (N.D.Miss.1976); *Davis v. Reed*, 72 F.R.D. 644 (N.D.Miss.1976). The rationale for this view was expressed in *Clanton v. Allied Chemical Corp.*, 416 F.Supp. 39 (E.D.Va.1976):

> [A] portion of the time expended was done so in presenting the issue of counsel fees. In light of the fact that the resolution of this issue inures only to the benefit of counsel, as distinguished from the plaintiff class, no allowance for such time will be considered in the Court's ultimate judgment.

There are persuasive authorities to the contrary. *E. g., Parker v. Matthews*, 411 F.Supp. 1059, 1066 (D.D.C.1976); *Torres v. Sachs*, 69 F.R.D. 343 (S.D.N.Y.1975), aff'd 538 F.2d 10 (2d Cir. 1976); *National Ass'n for Mental Health v. Weinberger*, 68 F.R.D. 387, 393 (D.D.C.1975); *Stanford Daily v. Zurcher*, 64 F.R.D. 680 (N.D.Cal.1974).

In *Parker v. Matthews*, however, the court indicated that it would generally reimburse counsel for the time spent on the fees application at a rate lower than that given for work done on the substantive

issues of the case. *Accord, Foster v. Boise-Cascade*, 420 F.Supp. 674, 692 (S.D.Tex. 1976), and *National Ass'n of Regional Medical Programs, Inc. v. Weinberger*, 396 F.Supp. 842 (D.D.C.1975). Here, while the issues relating to entitlement of fees were contested, they were not complex or difficult to master. Plaintiffs themselves recognized this fact when, in their December 23, 1976 memorandum to the court, they stated: "The recent Supreme Court decision in *Fitzpatrick v. Bitzer* . . . totally destroys the School District's Eleventh Amendment defense." Memorandum at 2.

We find that 505 hours claimed is excessive, given the nature of the controversy. Of the 505 hours expended, we find that 125 hours is reasonable and fair. Even this figure is somewhat high; however, we recognize that counsel engaged in a certain amount of discovery prior to our hearings on fees.

As noted previously, the court intends to discount the rate of remuneration for time spent on the fee application and bill of costs. In exercising our discretion, the court will bill hours spent on the fee application and bill of costs at 75% of the full rate. For ease of calculation, we will simply award the full rate, but cut by 25% the hours allowed in this category. Thus, we award 94 hours.

*(b) Craig S. Barnes*

Defendants have stipulated to the reasonableness of the services rendered and the time charged by Craig S. Barnes. Mr. Barnes has submitted an application for 1,182 hours. In light of this stipulation and our own investigation, the court finds the 1,182 hours reasonably necessary to the litigation. We note that Mr. Barnes' fee application was handled by attorneys from H&H, and thus there is no reason to adjust his charge for time spent in pursuit of fees.

*(c) National Association for the Advancement of Colored People, Legal Defense Fund*

LDF attorneys have submitted an application, through H&H for 1,415 hours. The

---

**23.** 96 hours accepted as reasonable at one-half the office rate = 48 full-rate hours.

time is divided among various LDF attorneys as follows:

| | | |
|---|---|---|
| James M. Nabrit, III. | 1029 hours )- | Senior attorneys |
| Jack Greenberg | 24 ) | |
| Norman J. Chachkin | 100 ) | |
| Vilma S. Martinez | 50 }- | Junior attorneys |
| Conrad K. Harper | 212 ) | |

TOTAL 1415 hours

█ Defendants object to the allowance of any of this time on the basis that the LDF failed to fulfill its burden of proof by introduction of admissible evidence. None of the LDF attorneys seeking fees maintained time records contemporaneous with the performance of services. The hours spent on the case were reconstructed from entries in daily calendars, expense records, memory and in some cases, entries in H&H time records which reflected conferences with LDF attorneys.

The evidentiary objection is based on Rule 803(6) of the Federal Rules of Evidence (the federal "shopbook" rule). Defendants contend that the information in the affidavits detailing time expended in this case was not compiled from records made at or near the time the events took place, nor were they kept in the regular course of business. While the affidavits are not strictly in compliance with Rule 803(6), they certainly qualify for admission under Rule 803(24). Rule 803(24) permits the court to admit hearsay evidence when (a) the statement is offered as evidence on a material fact; (b) the statement is more probative on the point than any other evidence which the proponent can procure through reasonable means, (c) the general purposes of the Rules of Evidence and the interest of justice will be served by admission of the statement, and (d) the adverse party has sufficient notice of the intent to introduce the statements so as to allow time for rebuttal at the hearing.

All the requirements of Rule 803(24) are met. The evidence is offered on a material fact, the evidence is the best available, defendants had adequate notice well in advance of the hearings, and the interest of justice are served by their admission. There is no question that LDF attorneys spent a considerable amount of time on the

*Keyes* litigation. To fail to compensate them would not be in the interests of justice in this case, or within the interest and intent of the civil rights fee award statutes. Therefore, we accept the affidavits of the LDF attorneys as admissible evidence.

Having done that, we must review the affidavits to determine the reasonableness of the compensation requested. Unlike the situation with Craig Barnes, there has been no stipulation of the reasonableness of the LDF hours. At our hearing, the testimony indicated that the number of hours included in the affidavits were "very conservative" estimates. This fact is also reflected in certain of the affidavits themselves. Nonetheless, in reviewing the affidavits and supporting documentation there appear to be a number of items which this court compensated at lower rates when submitted by H&H. First, the LDF has requested compensation for 13 round-trip flights from New York to Denver. There is listed one flight from New York to Chicago and six New York to Washington trips. Because time for conference in Denver and the flights themselves have been lumped together, it is difficult to determine what hours are requested for the flights alone.

We shall, however, use the same figures used in the H&H computations and permit billing for that time at one-half the normal office rate. Allowing six hours for the New York-Chicago round trip flights and four hours for the New York-Washington trips, total travel time comes to 147 hours. Halving that, we deduct 74 hours from the LDF request. These hours shall be divided evenly between senior and junior LDF staff members, which approximates their ratio of actual travel.

One other item is of interest. There is claimed 20 hours for work on preparation of the printed record for the Supreme Court hearings by Mr. Nabrit. Some of that time, according to the LDF description, appears to fall within the category of non-legal work, such as proofreading. Six hours will be deducted for non-legal work in connection with this entry.

In all other respects we find the hours submitted by the LDF to be reasonably necessary to the litigation. Thus, the LDF shall be credited with 1335 hours, 1,010 to senior partners and 325 to junior partners.

### (d) *Mexican American Legal Defense and Education Fund Inc.*

Plaintiff-Intervenors MALDEF seek reimbursement for 927 hours, divided as 133 hours for court appearances and 794 hours for out-of-court time. Time contributed by counsel is as follows:

| | |
|---|---|
| Paul A. Baca | 165 hours |
| Remigio Pete Reyes | 54 |
| Joaquin Guadalupe Avila | 182 |
| Drucilla S. Ramey | 15 |
| Carlos M. Alcala | 380 |
| Guadalupe Salinas | 15 |
| Sanford J. Rosen | 123 |
| TOTAL | 934 [24] |

Counsel for intervenors failed to maintain contemporaneous time records and have submitted affidavits to document their request. Most of the affidavits contain a reconstructed itemization of hours. The Avila affidavit simply states that counsel worked a total of 160 hours on research and writing, 20 hours on preparation for oral argument, and two hours in-court for oral argument.

Defendants object to the admissibility of all affidavits, with the exception of the Baca, Reyes, and Rosen affidavits (inasmuch as those three gentlemen testified at the hearing and in a subsequent deposition). All will be admitted under Rule 803(24) of the Federal Rules of Evidence.

The Avila affidavit, however, presents special problems. Mr. Avila recites a total of 182 hours in connection with the *Keyes* case. Of that total, 180 constituted research and writing and 2 hours were expended in court appearance. The affidavit merely presents this total figure and includes no attempt to tabulate the component hours in a manner meaningful to the court. This is in contrast to all other MALDEF lawyers who were able to reconstruct a day-by-day itemization through the use of daily calendars and other sources.[25]

The format of the Avila affidavit prevents the careful scrutiny which we have attempted to apply to the application of all other counsel. Nonetheless, we have reviewed the briefs and other submissions prepared with Mr. Avila's assistance and are able to assign a minimum number of hours to that preparation. The two hours of in-court time is not in dispute. Of the remaining time claimed, it is unreasonable to believe that Mr. Avila's participation and assistance could have been accomplished in any less than 100 hours. In contrast, the nature of the affidavit filed fails to justify the award of any larger figure. Mr. Avila is awarded two hours for in-court time and 100 hours for out-of-court research and writing.

Mr. Baca's affidavit indicates 12 hours attributable to intervenors' Motion to Retax Costs. We bill those hours at 75% of the full out-of-court rate. For simplification, the 12 hours are reduced to 9 hours, billable at the full rate.

The only remaining question is the time devoted by Mr. Alcala to research and writing the intervention motion. The time suggested in his affidavit seemed excessive and this view was affirmed by Mr. Sanford Rosen, former legal director for MALDEF, at his deposition where he conceded that the 127 hours listed might be high. Mr. Rosen's view was that the figure was 50 hours in excess of a reasonable figure. We agree. In conclusion we credit MALDEF with 133 hours for in-court time and 661 hours for out-of-court time.

### (10) AWARDS IN OTHER PUBLIC INTEREST CASES

As noted at the beginning of the analysis, in determining a fee award, each case must

---

**24.** Our calculations arrive at a total of 934 hours, as shown, but we accept the lesser total of 927 hours submitted.

**25.** The Ramey and Salinas affidavits were not minutely itemized. These lawyers, however, are billing only 15 hours each for work accomplished on specific pleadings and during a two-day period. The 30 hour total for this work is reasonable.

be judged on its own merits. Each civil rights case is in some degree different from any other. Thus, when considering awards in other cases one must do so with some circumspection and careful analysis. With that caveat, we note that there has been a wide divergence in court awards as noted in the margin.[26]

Fees in civil rights cases show no consistency and thus, can provide little guidance. The legislative history of the 1976 Amendment to 42 U.S.C. § 1988 provides some assistance. The Senate and House reports accompanying the bills, S. 2278 and H.R. 9552 indicate that awards in civil rights litigation should "be governed by the same standards which prevail in other types of equally complex Federal litigation." Sen. Report No. 94–1011 at 6 (June 29, 1976). The Senate Report continues by noting that "in computing the fee, counsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee paying client. . . ." *Id.* However, it is also observed that just as the courts should ensure that a fee is high enough to attract competent counsel, it should not be so great as to provide a windfall.

## (11) OTHER CONSIDERATIONS

Counsel from H&H seek an award of $60.00 per hour for both in-court and out-of-court time and regardless of whether the work was performed by partners or associates. The NAACP LDF lawyers seek re-muneration at $75 per hour for "partners" and $50 per hour for "associates" with no distinction made between in-court and out-of-court time. MALDEF counsel request $75 per hour for in-court time and $50 per hour for out-of-court time with no distinction between senior and junior members of the organization. It is generally the accepted practice to adjust the fee awarded not only according to the experience and expertise of each attorney, but according to the particular task being accomplished, with differing rates being paid for discovery, negotiation, research and courtroom work. *Lindy Brothers Builders, Inc., supra; Johnson v. Georgia Highway Express, supra.* Here, counsel have applied for somewhat uniform hourly rates with the rather limited exceptions noted.

■ A preferable method of computing an hourly figure for compensation is to consider all the factors previously reviewed, and then arrive at an hourly rate or other figure which will represent fair and reasonable compensation, compatible to that which might be received in commercial litigation.

Commercial rates in the Denver area are somewhat below those charged in other sections of the nation. For example, when this litigation was commenced the hourly rate for a partner at Holland & Hart hovered around $40 per hour. Craig S. Barnes charges $35 per hour as a basic rate and $40

---

**26.** The following fees have been awarded in civil rights litigation:

$5.00/hour—*Spero v. Abbott Laboratories*, 396 F.Supp. 321 (N.D.Ill.1975).

$12.00/hour—*Brito v. Zia*, 478 F.2d 1200 (10th Cir. 1973).

$14.00/hour—*Peltier v. City of Fargo*, 533 F.2d 374 (8th Cir. 1976).

$22.10/hour—*Davis v. Board of School Comm'rs.*, 526 F.2d 865 (5th Cir. 1976).

$20.00/hour for office work, $30.00/hour for court work—*Wyatt v. Stickney*, 344 F.Supp. 387 (M.D.Ala.1972); *Thompson v. School Board*, 363 F.Supp. 458 (E.D.Va. 1973), aff'd, 498 F.2d 195 (4th Cir. 1974).

$20.00/hour for office work, $40.00/hour for court work—*Latham v. Chandler*, 406 F.Supp. 754 (N.D.Miss.1976).

$30.00/hour average, $50.00/hour for appeal to United States Supreme Court—*Nor-*wood v. Harrison*, 410 F.Supp. 133 (N.D. Miss.1976).

$50.00/hour—*Stanford Daily v. Zurcher*, 64 F.R.D. 680 (N.D.Cal.1974); *Wallace v. House*, 377 F.Supp. 1192 (W.D.La.1974).

$50.00 to $70.00 per hour, depending upon experience—*Torres v. Sachs*, 69 F.R.D. 343 (S.D.N.Y.1975), aff'd, 538 F.2d 10 (2d Cir. 1976).

$64.80/hour—*Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 66 F.R.D. 483 (W.D.N.C. 1975).

$65.00/hour—*Davis v. County of Los Angeles*, 8 E.P.D. ¶ 9444 (C.D.Cal.1974).

In another case, the trial court arrived at an hourly figure and then increased it by some multiplier or premium. *Oliver v. Kalamazoo Bd. of Educ.*, 73 F.R.D. 30 (W.D.Mich.1976) (hourly rate multiplied by a factor of 2, resulting in an average award of $126/hour).

per hour in his area of expertise. In 1973, when the Supreme Court announced its ruling, Mr. Greiner's hourly rate was set at $46. That rate has grown since 1973, reflecting the rise in charges in the economy generally. Holland & Hart's rates, however, are significantly above the Colorado average. In 1975, for example, the "typical" Colorado attorney charged $47 per hour. *Note, Economic Survey,* 4 Colo. Lawyer 1929 (1975). Mr. Greiner's 1975 rate was substantially above that figure.

In awarding fees, several courts have taken into account payments authorized under the Criminal Justice Act, 18 U.S.C. § 3006A(d) for compensation to attorneys who represent indigent defendants in criminal cases. *E.E.O.C. v. Enterprise Ass'n Steamfitters Local 638,* 542 F.2d 579, 593 n.12 (2d Cir. 1976; *Panior v. Iberville Parish School Bd.,* 543 F.2d 1117, 1119 n.6 (5th Cir. 1976); *Knight v. Auciello,* 453 F.2d 852 (1st Cir. 1972); *Thompson v. School Bd.,* 363 F.Supp. 458, 465 (E.D.Va.1973). The current authorization under the Act is generally $30 per hour for in-court service and $20 per hour for out-of-court time.

A similar schedule for state court representation under rules promulgated by the Colorado Supreme Court is presently set at $35 and $25 per hour respectively. From 1972 until 1977 the figures were $25 and $15 per hour. Prior to the adoption of the Criminal Justice Act, counsel were often called upon to represent indigents with virtual guarantees that they would receive no compensation whatsoever. The legal profession was most cooperative in this regard. Over the years, the legal profession in Colorado has been extremely responsible in state and federal courts in representation of indigents in criminal cases without expectation of standard fees and in like representation of plaintiffs in employment discrimination cases.

■ We also observe that counsel from H&H had no expertise in desegregation or civil rights generally, when this case was commenced. This is also a factor to consider.

## (12) THE PUBLIC OR PRIVATE NATURE OF THE ENTITY PAYING THE AWARD OF FEES

■ Another factor in setting a reasonable award is whether the party paying the fees is a public entity. Testimony at the hearing on fees reflects that attorneys associated with Denver's most prestigious firms reduced their fees 50% to 75% when charging a public entity for their services. This reduction includes services in complex or protracted civil proceedings.

Courts have also recognized the corporate nature of the defendant when making fee determinations in civil rights cases. In *Oliver v. Kalamazoo Bd. of Educ.,* 73 F.R.D. 30, 48 (W.D.Mich.1976), it was stated:

> [T]he court is aware that this fee award will draw upon public funds at a time when financial resources are especially dear. While this does not diminish petitioners' right to recover just compensation, it is a factor which the court feels may properly be considered in determining what amount is reasonable.

*And see, Beazer v. New York Transit Authority* (S.D.N.Y. Jan. 24, 1977) and *Armstead v. Starkville Mun. Sep. School Dist.,* 395 F.Supp. 304, 308–9 (N.E.Miss.1975) (suggesting that economic impact could constitute a "special circumstance" justifying denial of any fee award).

The effect of the award on the defendants is not a consideration restricted to civil rights cases. It is applied to all forms of class action litigation, including commercial cases. The Uniform Class Action Act, as propounded by the National Conference of Commissioners on Uniform State Laws, provides that in determining an appropriate fee award the court is to consider the economic impact on the defendant when it is required to pay attorneys' fees because "of the vindication of an important public interest." Vestal, *Uniform Class Action,* 63 A.B. A.J. 837, 839 (1977).

■ While current law justifies an award of attorney fees in school desegregation cases, the fact that the public fisc (DPS) must bear the financial burden must not be overlooked. Attorney fee entitlement cannot jeopardize the financial realities of the agency paying the fees. Certainly, the payment of fees awarded herein—and not budgeted—will affect school programming. Thus, an award of fees must be tempered with the fact that the very entity mandated to restructure its school system, with attendant enormous outlays of money, will have to further expend public funds for attorneys who brought the restructuring to fruition. While this aspect of the case is not pivotal in our overall determination of fees, it certainly cannot be blindly disregarded.

### (13) PUBLIC POLICY

■ In awarding attorney fees in this type of action, the court is charged with the duty of being fair to attorneys whose efforts and professional abilities have produced discernable judicial results.

A proper balance must be struck which takes into account public policy. The allowance must be sufficiently reasonable, to encourage competent counsel to accept representation in private actions which vindicate violations of constitutional entitlement and are in the public interest. The allowance of fees should provide for sufficient incentive to competent counsel to remain in the field of public interest litigation. However, the fees awarded must be fair and reasonable under all the circumstances, and have a rational basis to results achieved together with considerations of other factors discussed herein. We have endeavored to follow this objective.

### VII.

■ The factors and considerations listed above are individually and collectively important and must be considered as a whole. We find that $35 is a reasonable hourly rate for attorneys' fees to be awarded Holland & Hart. This is in excess of the $25 per hour fee as approved in the employment discrimination case of *Barela v. United Nuclear Corporation,* 462 F.2d 149 (10th Cir. 1972); and $12 per hour approved in *Brito v. Zia,* 478 F.2d 1200 (10th Cir. 1973); and *see Hill v. Morton,* No. 76–1164, August 30, 1976 (10th Cir.) (opinion not for routine publication). In the latter case, arising from an award of attorney fees in a divorce case of an Indian allottee, the Tenth Circuit approved a fee of $1,500 for over 300 hours of legal work and rejected an award requested for $25 per hour.

Craig S. Barnes is awarded $35 per hour for 1,182 hours of service.

Attorneys from the Legal Defense Fund are experts in school desegregation cases and were among the initial moving forces in litigation in this field. Senior members of the LDF, who contributed 1010 hours, are awarded $45 per hour and junior members, who contributed 325 hours, are awarded $35 per hour.[27]

Certain of the MALDEF attorneys, such as Mr. Sanford Rosen, have had extensive experience in civil rights litigation. Others, at the time MALDEF intervened had a minimum of experience in the field.

Counsel have not requested this court to distinguish between senior and junior members of the organization, but instead have made the dividing line as in-court, and out-of-court hours.[28] After considering the relative experience of the various attorneys who worked on the case, and their individu-

---

**27.** The award of $45 per hour to senior members of the LDF, including James Nabrit, for services before this court and the Court of Appeals, compares favorably with the hourly rate allowed Mr. Nabrit for work before the Supreme Court. *Norwood v. Harrison,* 410 F.Supp. 133, 142 n.10 (N.D.Miss.1976).

**28.** Mr. Rosen testified that he does not consider the in-court/out-of-court distinction valid since a lawyer's time is equally dear in either setting. The views of the courts have been mixed with some awarding a flat rate and others a variable rate. *Compare Brito v. Zia,* 478 F.2d 1200 (10th Cir. 1973) *with Latham v. Chandler,* 406 F.Supp. 754 (N.D.Miss.1976) *and Wyatt v. Stickney,* 344 F.Supp. 387 (M.D.Ala.1972).

al contribution to MALDEF's total allowable hours, we find the following rates reasonable: in court, $45 per hour; out-of-court, $35 per hour. These rates will be applied to the allowable 133 in-court hours and 661 out-of-court hours.

Finally, we deduct 5% from the award to plaintiffs' counsel and 15% from the award to intervenors' counsel for the extent to which they did not prevail. The amounts awarded for attorneys fees under 20 U.S.C. § 1617 and 42 U.S.C. § 1988 are:

```
Holland & Hart    7,280 x $35 = 254,800 -  5%(12,740) = $242,060
Craig S. Barnes   1,182 x $35 =  41,370 -  5%( 2,068) = $ 39,302
NAACP LDF senior  1,010 x $45 =  45,450 -  5%( 2,272) = $ 43,178
          junior    325 x $35 =  11,375 -  5%(   568) = $ 10,807
MALDEF  in-court    133 x $45 =   5,985 - 15%(   897) = $  5,088
      out-of-court   661 x $35 =  23,135 - 15%( 3,470) = $ 19,665
```

TOTAL   $360,100

## VIII.

### A.

Defendants contest the award of out-of-pocket expenses to the extent that such expenses exceed the amount awardable as costs under F.R.C.P. Rule 54(d) and 28 U.S.C. §§ 1920 *et seq.* Plaintiffs and intervenors contend that expenses necessary to the litigation are subsumed under the heading of attorneys' fees and, therefore, the taxation statutes do not apply.

Courts have awarded expenses as part of the attorneys' fees and thus have avoided an item-by-item review under Rule 54(d) and the taxation statutes. Such awards have been made, for example, in *Davis v. School District,* 374 F.Supp. 141 (E.D.Mich. 1974), where the court simply stated without further comment that it viewed "attorneys' fees and out-of-pocket expenses as being synonymous." *Id.* at 141 n.2. In *Tasby v. Estes,* 416 F.Supp. 644, 648–9 (N.D.Tex.1976), the court stated that:

The Supreme Court in *Bradley [v. Richmond School Board],* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 . . . (1974) approved the District Court's allowance of the actual expenses of litigation, which included expenses for travel, hotel accommodations, restaurant meals, expert witnesses, investigation assistance, office supplies, transcripts (including those of depositions), and miscellaneous court fees. These were awarded in addition to ordinary costs of court . . . . .

A review of *Bradley,* however, does not show so lucidly the authority to award expenses. In both footnote and text, the Court distinguished between the trial court's award of counsel fees and expenses. 416 U.S. at 705 n.7 and 706, 94 S.Ct. 2006. In the discussion following, the Court referred only to attorneys' fees. Concluding their consideration of 20 U.S.C. § 1617, the Court held that a trial court, in its discretion "may allow the petitioners reasonable *attorney's fees* for services rendered" and remanded the case for further proceedings consistent with the opinion. 416 U.S. at 724, 94 S.Ct. at 2022 (emphasis added). Thus, whether the *Bradley* Court authorized any award of expenses under § 1617 is less than clear.

In *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the court withdrew the authority of the judiciary to award fees on the "private attorney general" theory. Nonetheless, it expressly recognized certain exceptions to the "American Rule" against fee awards, including the equitable power to assess fees when the losing party has acted in bad faith, vexatiously, wantonly, or for

oppressive reasons. 421 U.S. at 258–9, 95 S.Ct. 1612. *Cf. Armstrong v. O'Connell,* 416 F.Supp. 1325 (E.D.Wis.1976). Here again, however, the issues are clouded. After discussing the exceptions to the American Rule, the Court noted that Congress has established specific statutes dealing with taxable costs.

> Congress has not repudiated the judicially fashioned exceptions to the general rule against allowing substantial attorneys' fees; but *neither has it retracted, repealed, or modified the limitations on taxable fees* contained in the 1853 statute and its successors.[29] (emphasis added)

*Id.* at 260, 95 S.Ct. at 1623. Because the issue was not relevant in *Alyeska* the Court did not determine whether out-of-pocket expenses may be awarded within the concept of fees as defined in the statutes or within the court's equity power and in contravention of 28 U.S.C. §§ 1920 *et seq.*

Reference to the various civil rights fee award statutes would seem to indicate that expenses beyond those allowed in the taxation statutes cannot be allowed. Both 20 U.S.C. § 1617 and 42 U.S.C. § 1988 speak in terms of the award of "a reasonable attorney's fee *as part of the costs*" (emphasis added). It seems clear that the language of the statutes speak of attorney fees under the appellation of *costs.* No provision is included in any statute for inclusion of expenses as costs. The Supreme Court in *Alyeska* observed that Congress has placed a limitation on recoverable costs, and has extended the awardable costs to cover only fees of the prevailing attorneys and those items listed in 28 U.S.C. §§ 1920 *et seq.*[30]

Accordingly, there exists no statutory right to the payment of out-of-pocket expenses in an award of fees under 20 U.S.C. § 1617 and 42 U.S.C. § 1988.

Alternatively, of course, an award of expenses could be accomplished under the umbrella of the equity power of the court, which was left untouched by *Alyeska.* To do this, however, would again raise the Eleventh Amendment immunity question avoided earlier by resort to the fee statutes and *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).[31] The answer to the immunity question shall wait for another day, however, because in the exercise of the court's discretion under its equity power, we choose to reimburse as expenses no more than would be allowed under the regular taxation statutes.

For at least two reasons, the exercise of the court's discretion here is not influenced by *Northcross v. Board of Education,* 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973), where the Court stated that attorneys' fees normally should be granted. First, it is obvious that in *Northcross,* as in *Bradley,* the Court spoke only of attorneys' fees and not of expenses. Secondly, the *Northcross* decision was based upon a statutory award of fees, and not one based on the equity powers of the trial court.

### B.

Plaintiffs have previously submitted two bills of costs to the Clerk of the Court. Certain items were approved by the Clerk

---

**29.** At 421 U.S. at 255, 95 S.Ct. 1612, the Court traces the 1853 statute to the present 28 U.S.C. §§ 1920 and 1923.

**30.** Plaintiffs and intervenors would have the court refer to the legislative history of the fees statutes here involved. Resort to legislative history, however, is only appropriate when a statute is unclear. In this case, the taxation of

fees as costs and the definition of taxable costs under 28 U.S.C. §§ 1920 *et seq.* is unambiguous.

**31.** For a pre-*Fitzpatrick v. Bitzer* analysis of the immunity question, see Note, *Attorneys' Fees and the Eleventh Amendment,* 88 Harv.L. Rev. 1875 (1975).

and others rejected. Upon plaintiffs' Motion for Taxation of Costs, the following items, in addition to those already approved are allowed:

```
Holland & Hart

Appeal Bond               $    10   (Ex. 46)
Deposition Costs          $   638   (Motion for Taxation at 7)
Fees and Expenses of
Certain Expert and
Other Witnesses           $19,867   (Ex. 63-4, Plaintiff's
                                     answers to Interrogatories
            SUB TOTAL     $20,515    at 12).

          MALDEF application

          Fees and Expenses of
          Dertain Expert Witnesses          $5,541

                          SUB TOTAL    $5,541 32
```

---

In reviewing plaintiffs' and intervenors' application for expenses the major problem is distinguishing allowable expenses. This is largely a matter of burden of proof on which the various applications and briefs are of little assistance. The largest item of award is expert witness fees and expenses. Generally, awards of expert witness fees are not approved absent prior acquiescence of the court or pursuant to court appointment. *Mikel v. Kerr,* 499 F.2d 1178 (10th Cir. 1974). This case presents an exceptional circumstance warranting an award of expert witness fees. Without the testimony of experts, the original claim could not have been established nor a viable desegregation plan determined. Therefore, we have awarded all costs associated with expert witness fees and expenses which have been identified as paid by plaintiffs and intervenors.

### C.

In addition to reimbursement request for monies paid for expert witnesses, During the important first year of the case, plaintiffs have moved for "reimbursement" for certain "experts" to whom no monies have been paid, i. e. Dr. Paul D. Klite and Professor George E. Bardwell. Together with other interested parties in the community they assisted in bringing plaintiffs' claims to a successful conclusion.

Prior to the institution of this lawsuit, Dr. Klite was a Professor of Medicine at the University of Colorado Medical School. During the critical first year of the lawsuit, he devoted full time to researching the discriminatory practices of the Denver School Board. Some of his work involved original research, although the bulk consisted of compiling information already maintained by the defendant school district.

Working with Dr. Klite was Professor George Bardwell, a Professor of Mathematics and Statistics at the University of Denver. Professor Bardwell developed computer programs, supervised the actual programming and input into the system, and, working with the attorneys involved, designed a presentation format for the results of the school district study. Unlike Dr. Klite, however, Professor Bardwell did not terminate his academic relationship during the time he worked on the *Keyes* litigation.

---

**32.** The actual request on the bill of costs as submitted was $5,792. Some of that amount has previously been approved by the Clerk of the Court.

During the important first year of the case, Professor Bardwell arranged with the University of Denver to teach no classes and, instead, concentrate on research activities. His salary continued without reduction. The subject of his research was, of course, the *Keyes* litigation. Using allotted research time, Professor Bardwell utilized University's computer and certain of its manpower to introduce data into the system. During the second year of the litigation Professor Bardwell took his sabbatical leave (with pay) and again devoted substantial time to the litigation. During the latter part of this second year, Professors Bardwell and Klite took advantage of their association by forming Medical Data Services Corporation, a business enterprise directed at computer billing of doctors' accounts.

Both men recognized at the inception of the litigation that their services were on a voluntary basis and neither had any expectation of compensation. Neither man kept time records, nor billed for services rendered.

Under this basis, the court denies an award of any sum as "reimbursement" for Professor Bardwell and Dr. Klite. An award of fees to persons in their posture in the litigation would be equivalent of the court's approval of a contingent fee arrangement for an expert.[33] We will not place our imprimatur on such an arrangement while it remains a questionable practice under the *Code of Professional Responsibility*. See, *Colorado Code of Professional Responsibility, Disciplinary Rule 3–102; Dietrich Corporation v. King Resources, Company,* unpublished, No. C–3424, Order 1976–12 (D.Colo. Dec. 23, 1976) at 17–20 (contingent fee arrangement with expert disapproved).

Furthermore, it would seem anomalous to award as "expenses" or "costs" of litigation, sums which were never paid as expenses or costs. This is especially true, where as here, one of the researchers was being paid on a full-time basis by a university and incurred no costs in relation to the research accomplished or assistance rendered. To no degree are we minimizing the excellent advisory services rendered by Professor Bardwell and Dr. Klite. However, upon our review of the law, we find no basis for an award of expert fees.

## IX.

The following is a summary of fees and costs requested and awarded:

### FEES.

| Organization | Hours and Rates Requested | Total | Hours and Rates Awarded | Total |
|---|---|---|---|---|
| Holland & Hart | 7,816 $60 per hour | $474,972 | 7,280 $35 per hour | $242,060 |
| Craig S. Barnes | 1,182 $50 per hour | $ 59,125 | 1,182 $35 per hour | $ 39,302 |
| NAACP LDF Senior Lawyers Junior Lawyers | 1,415 $75 per hour $50 per hour | $ 97,112 | 1,335 $45 per hour $35 per hour | $ 53,985 |
| MALDEF In-court Out-of-court | 927 $75 per hour $50 per hour | $ 49,681 | 794 $45 per hour $35 per hour | $ 24,753 |
| | | $680,890 | | $360,100 |

**33.** Neither Professor Bardwell nor Dr. Klite were qualified as an expert in the trial phase of the litigation nor did either testify as an expert.

COSTS AND EXPENSES

| Organization | Amount Requested | Amount Awarded |
|---|---|---|
| Holland & Hart Application | $152,989 | $20,515 |
| MALDEF Application | $ 10,933 | $ 5,541 |
| Total | $163,922 | Total $26,056 |

## ORDER

The following sums are awarded as reasonable attorneys' fees and costs to the parties indicated:

Attorneys' Fees:

```
Holland & Hart            $242,060
Craig S. Barnes          $ 39,302
NAACP Legal Defense Fund  $ 53,985
MALDEF                    $ 24,753
```

Costs, in addition to those already awarded by the Clerk:

```
Holland & Hart           $ 20,515
MALDEF                   $  5,541
```

These amounts are awarded to the parties designated and against defendant, School District No. 1, Denver, Colorado. The amounts shall be paid in four equal semi-annual payments, the first payment to be due on January 16, 1978.

The Clerk of the Court is directed to enter judgment reflecting this Order. This opinion constitutes findings of fact and conclusions of law.

The Court hereby expressly determines that there is no just reason for delay in the entry of final judgment and accordingly directs that this Order is a final judgment and is entered and deemed a final judgment in accordance with Rule 54(b) of the Federal Rules of Civil Procedure.